FIRST DIVISION
APRIL 19, 2010

No. 1-07-2753

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 97 CR 27365 |
| | ) | |
| JOSEPH RUSH, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James Egan, |
| | ) | Judge Presiding. |

JUSTICE PATTI delivered the opinion of the court:

Following a jury trial on remand, defendant, Joseph Rush, was found guilty of first degree murder and sentenced to 42 years in prison.   Defendant appeals his conviction and raises the following issues for our consideration: (1) whether the trial court erred in ruling that Ginger Altman's eyewitness testimony from his first trial was admissible at the second trial under the dead-man's exception to the hearsay rule; (2) whether even if Altman's testimony could be admitted at his second trial, certain portions should have been redacted from the transcript before it was read to the jury because it was not subject to cross-examination and/or not made under oath; (3) whether the trial court abused its discretion by denying defendant's request to adduce evidence of the symptoms of Altman's psychiatric condition and/or the circumstances surrounding her death; (4) whether the trial court improperly allowed hearsay testimony from

1-07-2753

Chicago police sergeant Nowakowski under the guise of explaining his investigatory procedure; and (5) whether the trial court interfered with his ability to knowingly exercise his constitutional right to testify by refusing to rule on his pretrial motion *in limine* to bar evidence of his prior felony conviction unless and until he testified.

BACKGROUND

This case arises from the murder of Zdzislaw Szczerba, also known as "Jimmy," who was attacked and beaten on September 21, 1997, and died two days later from his injuries. This case was first tried before a jury in August 2000. On appeal, this court reversed defendant's felony murder conviction and remanded for a new trial after finding that the trial court improperly allowed Dr. Pan, a psychiatrist that had examined Ginger Altman prior to trial, to testify in the presence of the jury concerning Altman's competency to testify. People v. Joseph Rush, No. 1-00-3864 (June 16, 2003)(unpublished order under Supreme Court Rule 23).

Pretrial Motions

On October 18, 2006, upon remand, the trial court considered and denied defendant's motion to suppress the admission of evidence of three fishing poles that had been seized by the police from defendant's home on September 23, 1997. Prior to the second trial, defendant also filed a motion *in limine* to bar the State from admitting Ginger Altman's testimony from the first trial. Altman died on August 18, 2000, two days after she testified at defendant's first trial. Defendant asserted that she was not thoroughly cross-examined at the first trial and that admitting her testimony at the second trial would deprive the jury of the necessary means of evaluating her demeanor. At the hearing on the motion, defense counsel also challenged the

2

reliability of Ginger's testimony on the basis that she was required by the State to testify at the first trial and had experienced a schizophrenic attack on the day she died, which was less than 48 hours after she had testified. The trial court in denying defendant's motion stated, in pertinent part:

> "[T]he Defense has argued you would not be able to see the demeanor of Ginger Altman. That is very true and demeanor is something that jurors do pick up on. *** [A]lthough demeanor *** is important *** I believe [under] the Crawford case there was the opportunity and [defense counsel] took advantage of that opportunity [for] cross-examination [of] Miss. Altman."

Prior to trial, the State moved to introduce the victim's description of his attacker as given to his nephew, Henry Swek, before the victim underwent surgery on September 22, 1997. The State's motion was denied after the trial court concluded that the hearsay evidence did not qualify as a dying declaration and, therefore, was not admissible. The trial court also considered defendant's motion to bar the use of his prior conviction for aggravated criminal sexual assault for impeachment purposes should he decide to testify at his new trial. The court declined to rule on the admissibility of this prior conviction until and unless he testified, which he ultimately chose not to do.

The trial court also denied defendant's request to admit the protocol of Dr. Nancy Jones

as to the cause of Ginger Altman's death.[1]  The court noted that allowing the admission of this

protocol would lead to having to admit Dr. Pan's opinion as to competency, which, based upon

this court's direction on remand, would be improper.  The trial court also found that Ginger

Altman was competent to provide witness testimony and stated:

> "My ruling as to Miss Altman's competency, I've
>
> taken into consideration the testimony of Dr. Pan, also his
>
> reports, also the Medical Examiner's protocol, Dr. Pan stated
>
> she was competent to serve as witness.  I have also had the
>
> opportunity to do motions, see her testimony.  Obviously she
>
> was not crawling around while testifying before Judge
>
> Schreier [the trial court judge at defendant's first trial].  I
>
> believe that based on information I have that Miss Altman's
>
> testimony, she is competent to provide witness testimony.
>
> Her testimony will be allowed at trial."

The trial court allowed evidence to be adduced at trial concerning the medications that

Ginger had been prescribed, the name of her diagnosed mental illness, and the observations of

---

[1]During the pretrial hearing, the parties stipulated that the investigation done by the

medical examiner's office in Ginger Altman's death revealed that when police arrived at her

home on August 18, 2000, around 1:20 a.m., she was found crawling on the floor, screaming

incoherently and banging her head on the floor, walls, and door.  It was further stipulated that

she died of droperidol reaction due to excited delirium as a result of schizoprhrenia.

her mother on the day that Ginger provided her statement to police on September 23, 1997.


Jury Trial

At defendant's second jury trial, Mary Swek, the victim's sister, testified that her brother was 56 years old in 1997 and that he liked to go fishing in Marquette Park, which was close to where he lived. During the afternoon of September 21, 1997, she saw her brother at Loyola University Hospital, where the two had gone to visit the victim's wife, who had recently undergone surgery. Mary testified that when she saw her brother at Loyola Hospital he was in good physical condition and was wearing a gold watch and a gold ring with a ruby in it that he had received from his father.

Around midnight on September 21, 1997, Mary received a call from the victim and he asked her to come over to his house. She arrived there at approximately 12:20 a.m. and found it hard to recognize him because his face was so bruised and swollen. She further testified that he was wet with mud and blood and that he had cuts on the back of his head. After cleaning him off and helping him to change into new clothes, she drove him to Holy Cross Hospital. Mary remained with her brother until he was brought in for surgery, which was the last time that she spoke to him. At trial, Mary identified three fishing poles that had been recovered by police from the dining room of defendant's home as having belonged to the victim.

Henry Swek, the victim's nephew and Mary's son, testified that he met his mother at Holy Cross Hospital in the early morning hours of September 22, 1997. He observed that his uncle's eyes were very swollen, that he had abrasions on his face, and that there was a large

5

bump on the back of his head. Henry testified that he spoke with his uncle before he went into surgery, that his uncle never regained consciousness after the surgery, and that he died in the early morning hours of September 23, 1997. Henry testified that a detective called him later that morning and that they "spoke about what my uncle told me." Henry agreed to meet police detectives later that day in Marquette Park, where he found a "Thermos" brand cup and the cover to a radio that had belonged to his uncle.

Chicago police sergeant John Nowakowski testified that on September 23, 1997, he and Detective Nesling were assigned to investigate this case. He first spoke to Detective Rose, who had already spoken with Henry Swek. The two officers went to the medical examiner's office, later spoke with Mary Swek, and then drove to Marquette Park. Sergeant Nowakowski testified that prior to going to Marquette Park the officers had a description of the offender. Over the objection of defense counsel, he testified that he received the following physical description of the offender: a male, approximately 6 feet tall, 135 to 140 pounds; with black curly hair; and a tattoo on his arm that spelled "Joe." At Marquette Park, the officers observed defendant and stopped him because he matched the physical description of the offender. Defendant identified himself by name and pulled up his sleeve and showed the officers a tattoo on his arm that spelled "Joe." Defendant was then arrested and after being advised of his *Miranda* rights told Sergeant Nowakowski that on the evening of September 21, he had been in a fight in the park with an "old guy" and that he was with his girlfriend Ginger Altman at the time.

After defendant was arrested, Sergeant Nowakowski met Henry Swek in the park. Henry had already discovered some items that he identified as belonging to his uncle, including the

back cover of a radio and a silver insulated Thermos cup. Sergeant Nowakowski observed red spots that appeared to be dried blood on Redfield Drive, which circles the park. He later went to Ginger Altman's house, and she accompanied police to defendant's home, which appeared to be abandoned. Police recovered three fishing poles from the dining room, which were introduced into evidence at trial. The police also went to the victim's home, where there were stains that appeared to be blood on the exterior and interior of the victim's car.

Sam Black, a former assistant State's Attorney (ASA) testified that on September 23, 1997, he was assigned to felony review and spoke with Ginger Altman, defendant, and Detectives Nesling and Nowakowski. Defendant told him that he and his girlfriend, Ginger Altman, had gone fishing in Marquette Park on September 21, 1997, and that he and the victim were drinking beer and vodka. The victim gave defendant some money to buy more beer and vodka and when he returned to the park the victim twice pushed him into the water and laughed at him. Defendant was wet and cold and asked the victim how he was going to dry off, but the victim did not help him. Defendant told Black that he struck the victim twice in the head and took the victim's fishing poles because he thought that he deserved to be robbed. Defendant also told Black that he and his girlfriend took the fishing poles back to defendant's house. He did not represent to Black that he had been injured or that the victim had struck him.

Black further testified that on September 23, 1997, after speaking with Ginger Altman, that he took her handwritten statement sometime after 8 p.m. In her statement, she provided that Joe had hit Jimmy many times and that "blood was smearing all over and that Jimmy's shirt was ripped and bloody." Ginger also provided in her statement that "Joe kicked Jimmy for a while

and stopped and started kicking Jimmy again and then stopped and walked away and then kicked Jimmy again." Black testified that Ginger had three sodas and some coffee while at the police station and had used the bathroom. Black did not know that Ginger wore incontinence pads, nor did he not notice any smell of urine when he spoke with her.

The State published Ginger Altman's testimony that she provided under oath on August 16, 2000, at defendant's first trial by having two individuals read the transcript before the jury, while the trial judge read anything that the court had stated. Ginger's testimony can be summarized as follows: On the evening of September 21, 1997, Ginger met defendant at Marquette Park near the lagoon. Defendant had been Ginger's boyfriend since grade school. When she arrived at the park, defendant was sitting with an older white man who introduced himself to Ginger. She did not remember his name, but it might have been Jimmy. The two men were fishing and drinking beer when the older white man gave money to defendant to purchase vodka. Ginger was sitting alone with the older white man while defendant went to purchase the alcohol and he showed her a ring with a red ruby in it and told her that it was from Poland and that he had received it from his father.

After defendant returned to the park, the two men shared the bottle of vodka. Sometime thereafter, the older white man pulled defendant into the water and held defendant's head under the water for three to five seconds. The two men subsequently walked toward the older man's car. Defendant slapped and kicked the man and took his watch and $3 from his back pocket. The older man at some point fell to his knees and he was speaking in a foreign language. Ginger testified that defendant did not remove any fishing poles from the trunk, but that when

8

they returned to defendant's apartment after the incident, he put fishing poles down on the dining room table. She later went to defendant's home with Detective Nowakowski and pointed out the three fishing poles to the police detective.

Ginger admitted that she had provided a statement to ASA Black on September 23, 1997, and had testified under oath before the grand jury on October 9, 1997. She acknowledged that she told the grand jury that defendant had taken fishing poles from Jimmy's car trunk and that she went to visit defendant in jail on October 7, 1997, to see if he remembered what he had done, and that defendant told her that he had slapped, kicked and pushed the man. Ginger also acknowledged that she had told ASA Black that Joe went after Jimmy and slapped and kicked him, that Jimmy was on his knees praying in Polish and holding his chest, and that Joe took Jimmy's watch and ring. Ginger testified that ASA Black did not include in her written statement everything that she had told him and stated that the old man had grabbed her chest when they were sitting by the cooler. At the close of Ginger's testimony, the trial court asked her what medications she was taking and she responded, Haldol and Depakote. She testified that she was also taking these medications when she provided her statement to ASA Black in September 1997.

The State introduced the victim's postmortem report, which indicated that the victim had sustained numerous external injuries including to his face, back of the head, left arm and hand, and his right leg and big toe. He sustained internal injuries to his skull, brain, and chest wall. The autopsy concluded that the victim died on September 23, 1997, of craniocerebral injuries due to blunt head trauma and that the manner of death was homicide.

9

Dr. Samuel Schimel testified on behalf of defendant that he was Ginger Altman's doctor for several years and that in September 1997, he had prescribed for her Haldol, Depakote, and Synthroid. Ginger took Haldol for her schizophrenia or schizo-affective disorder which she suffered from in September 1997. Dr. Schimel testified that Haldol would make Ginger calmer and allow her to function in her daily life and that it would be "hard for her to keep daily life organized" without it. The possible side effects of Haldol included dry mouth, muscle thickness, and sometimes confusion. She took Depakote because it helped to control her seizures and Synthroid for a thyroid condition.

Nancy Altman, Ginger's mother, testified on behalf of defendant that in September 1997, her daughter was 37 years old and was taking Haldol, Depakote, Thyroxine, and Synthroid. Nancy testified that Ginger had lived at home her entire life and that she kept Ginger's medication for her and was responsible for dispensing it. On September 23, 1997, around 10 a.m., police detectives arrived at Nancy's home and wanted to speak with Ginger about a fight in the park. Ginger accompanied the detectives to the police station and Nancy did not see her daughter again until she was brought home that evening around 10:30 p.m. She testified that when her daughter left home on the morning of September 23, she did not take her purse, which contained her incontinence pads that Ginger would change each time that she went to the bathroom. Nancy further testified that when her daughter arrived home on the evening of September 23, 1997, she was tired and had to change her clothes because she had wet herself.

Following closing arguments, the jury found defendant guilty of first-degree murder. He

was subsequently sentenced to 42 years in prison.

ANALYSIS

We first address defendant's claim that the trial court erred in ruling that Ginger Altman's testimony from the first trial was admissible at the second trial under section 115-10.4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.4 (West 2006)). Defendant contends that this admission was improper because the testimony lacked the requisite trustworthiness and it did not allow the jury to observe the witness and her demeanor due to her mental illness and the medications that she was taking. Defendant asserts that the script reading of Ginger's testimony bolstered her credibility as it was read by a person without her mental illness and unusual demeanor.

It is well established that the rule against hearsay generally prevents the introduction at trial of an out-of-court statement offered to prove the truth of the matter asserted. People v. Spicer, 379 Ill. App. 3d 441, 449 (2007). Section 115-10.4 of the Code contains one of many exceptions to the hearsay rule and allows for the admission of a prior statement of a deceased witness. This section provides, in pertinent part: "(a) A Statement not specifically covered by any other hearsay exception but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule if the declarant is deceased and if the court determines that: (1) the statement is offered as evidence of a material fact; and (2) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) the general purposes of this Section and the interests of justice will best be served by admission of the statement into evidence.* * * (d) Any prior

11

statement that is sought to be admitted under this Section must have been made by the declarant under oath at trial, hearing or other proceeding and been subject to cross-examination by the adverse party." 725 ILCS 5/115-10.4 (West 2006).[2]  Therefore, as this court has previously explained, with respect to a dead man's prior testimony, section 115-10.4 requires a court to consider (1) materiality; (2) probative value; (3) trustworthiness of the statement; (4) interests of justice; (5) and prior opportunity for cross-examination.  People v. Melchor, 376 Ill. App. 3d 444, 450 (2007).

The standard of review for the first four requirements is abuse of discretion, while we review the fifth requirement under a de novo standard as it does not involve the trial court's discretion. Melchor, 376 Ill. App. 3d at 451.  A trial court abuses its discretion when its "ruling is arbitrary, fanciful or unreasonable, or when no reasonable person would take the same view." People v. Jenkins, 383 Ill. App. 3d 978, 989 (2008).

In this case, defendant does not contend on appeal, nor could he, that Ginger's prior testimony was not subject to cross-examination at the first trial, or that the trial court abused its discretion by finding that the requirements for materiality, probative value, and the interest of justice were satisfied for purposes of admitting the testimony.  Defendant's argument is based upon his contention that although the trial court found Ginger was competent to provide witness

_____

[2]Section 115-10.4 of the Code was amended, effective June 17, 2005, when language was added to the end of paragraph (d) that provided: "and been subject to cross-examination by the adverse party."  Pub. Act 94-0053, eff. June 17, 2005.  This section of the Code, as amended, is applicable to this case.

testimony, it should not have been admitted under section 115-10.4 because it did not meet the requirements for trustworthiness.

Section 115-10.4 specifically requires the statement to have "circumstantial guarantees of trustworthiness." "This court has held that this trustworthiness requirement limits the dead-man's exception 'to exceptional circumstances.' " Melchor, 376 Ill. App. 3d at 452-53, quoting People v. Smith, 333 Ill. App. 3d 622, 634 (2002). When evaluating trustworthiness of hearsay testimony, a trial court must consider the totality of the circumstances surrounding the declaration and no one factor is required or dispositive. Melchor, 376 Ill. App. 3d at 453. "In addition to lack of cross-examination, other factors of untrustworthiness include: (1) the witness's 'motivation to testify falsely'; (2) the witness' prior convictions and criminal history; (3) the witness's use of drugs or alcohol at the time of the events; and (4) the witness's 'hopes of making a deal.' " Melchor, 376 Ill. App. 3d at 455, quoting Smith, 333 Ill. App. 3d at 637. Defendant relies upon Melchor and Smith to support his claim in this case that Altman's testimony was untrustworthy and should not have been read to the jury.

In Melchor, the trial court admitted the former testimony of Louis Ortiz, who was the sole eyewitness to identify defendant as the shooter. Melchor, 376 Ill. App. 3d at 445. He had previously testified about the murder at the trial of a codefendant but had died prior to defendant's trial. Melchor, 376 Ill. App. 3d at 445. We found that the codefendant's opportunity to cross-examine was not the same as the opportunity for the defendant as the motives of the two were not aligned and the codefendant had every incentive to shift culpability away from himself and to defendant. Melchor, 376 Ill. App. 3d at 454-55. We noted that Ortiz's

credibility was the key issue and that he was the only link between the defendant and the crime. Melchor, 376 Ill. App. 3d at 454. In reversing the conviction and remanding for a new trial, we found that "Ortiz's prior testimony was untrustworthy because of: the lack of cross-examination where his testimony was the only link between defendant and the crime; his felony convictions and criminal history; his use of alcohol at the time of the events; and his possible hopes of currying a favor with the State in light of a pending robbery charge." Melchor, 376 Ill. App. 3d at 456.

In Smith, the trial court admitted the grand jury testimony of Jesse Hodges, who had died prior to the defendant's trial for murder and attempted armed robbery. Smith, 333 Ill. App. 3d at 625, 627. As with Melchor, this case was decided prior to when cross-examination was a statutory requirement for admission of testimony under the dead-man's exception to the hearsay rule. While the case was ultimately remanded for a new trial on other grounds, we addressed the issue of whether Hodges' testimony should have been admitted under section 115-10.4 because it was likely to recur at his new trial. Smith, 333 Ill. App. 3d at 634. This court found that Hodges' grand jury testimony did not bear sufficient guarantees of trustworthiness and, thus, was not admissible under section 115-10.4. Smith, 333 Ill. App. 3d at 638. Some of the factors that were considered when reaching this conclusion were the following: Hodges' testimony was not subject to cross-examination; Hodges was in police custody when he testified and there was the possibility that he testified in hopes of making a deal with the State; Hodges' girlfriend had previously dated the defendant; Hodges and the defendant were members of different gangs; Hodges had used marijuana at the time of the defendant's alleged confession; and Hodges had a

14

prior conviction. Smith, 333 Ill. App. 3d at 637-38. This court specifically noted that it was "a significant factor militating against trustworthiness that Hodges' grand jury testimony was not subject to cross-examination. Cross-examination could have explored the possibility of Hodges' bias and motivation to lie." Smith, 333 Ill. App. 3d at 637.

Turning to the instant case, unlike in Smith and Melchor, Ginger was subjected to cross-examination by defendant's attorney at the first trial. Moreover, there was no evidence of any of the following: that she was on nonmedically prescribed drugs or was intoxicated at the time of her observations concerning defendant; that she had a criminal background; that she hoped to make a deal with the State in exchange for her trial testimony; or that she somehow had a motivation to testify falsely against defendant. On the contrary, defendant told police that Ginger was his girlfriend and she testified that she had been defendant's girlfriend since grade school. This type of relationship made it less likely that Ginger would have falsely implicated defendant.

We also note that unlike in Melchor, Ginger's testimony was not the only link between defendant and the crime. Sergeant Nowakowski and ASA Black both testified that defendant implicated himself in the crime when they spoke to him on September 23, 1997. In addition, there was physical evidence linking defendant to the offense because the victim's three fishing poles were discovered at defendant's house on the day of the victim's death. Consequently, Ginger's credibility was not as central an issue as it was for the testimony of the deceased witness in Melchor. While clearly it would have been preferable if Ginger could have provided live testimony, which would have allowed the jury to observe her tone of voice and demeanor,

that inability did not require the trial court to exclude Ginger's testimony at the second trial under the circumstances in this case. Accordingly, we find the trial court properly allowed Altman's testimony from the first trial to be read to the jury at the second trial under section 115-10.4 of the Code.

Defendant next contends that even if Ginger's testimony could be admitted under section 115-10.4, the portions of her testimony consisting of prior inconsistent statements that were admitted as substantive evidence at his first trial, and were not subject to cross-examination and/or made under oath, should have been redacted from the transcript read to the jury pursuant to Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), and section 115-10.4 of the Code. Defendant's argument is based upon those portions of Ginger's grand jury testimony, and her written statement taken by ASA Black, which were admitted at his first trial under section 115-10.1 of the Code, which governs the admissibility of prior inconsistent statements.

The State asserts that defendant has waived this argument for purposes of review because he did not raise the issue at trial or in a posttrial motion. See People v. Enoch, 122 Ill. 2d 176, 186 (1988)(to preserve an issue for appellate review, both a trial objection and a written posttrial motion raising the issue are required). Waiver notwithstanding, we have reviewed the issue and find no basis to conclude that the testimony required redaction before it was read to the jury. See People v. Carter, 208 Ill. 2d 309, 318 (2003)(waiver is a limitation on the parties and not the court).

A defendant is entitled to confront the witnesses against him by the confrontation clauses

of both the United States and Illinois Constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. In Crawford v. Washington, the Supreme Court further interpreted the confrontation clause and held that the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203, 124 S. Ct. 1354, 1374 (2004). The Crawford Court reiterated that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Crawford, 541 U.S. at 60 n.9, 158 L. Ed. 2d at 198 n.9, 124 S. Ct. at 1370 n.9.

Here, Ginger's testimony from the first trial included portions in which she was questioned about prior inconsistent statements that she had made to ASA Black in September 1997, and to the grand jury in October 1997. Defendant concedes that these statements were properly admitted at the first trial under section 115-10.1 of the Code. This section of the Code allows for the admission at trial of a prior statement that is inconsistent with the witness's trial testimony when the witness is subject to cross-examination concerning the statement and the statement was made under oath, or the statement is acknowledged under oath by the witness who made the statement and has personal knowledge of the events or conditions described therein 725 ILCS 5/115-10.1 (West 2006). Defendant now claims that the statements were inadmissible at the second trial because he did not have an opportunity to cross-examine Ginger on them at the time the statements were actually made. We reject this argument because defendant did have an opportunity to cross-examine Ginger about these statements after she testified on direct

17

examination at the first trial, and we find no basis to conclude, nor does defendant provide us with one, that Crawford or section 115-10.4 of the Code required the redaction of this properly admitted testimony from his first trial.

Next, defendant contends that the trial court interfered with his right to present a defense by denying his request to adduce evidence of the symptom's of Ginger's psychiatric condition, the effects of her medication, and the circumstances of her death just two days after she testified at his first trial. He further asserts that the trial court should have allowed Ginger's doctor to explain her mental disorder and how it would have affected her abilities to observe and recall events.

"Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion." People v. Caffey, 205 Ill. 2d 52, 89 (2001). As previously stated, an abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. Caffey, 205 Ill. 2d at 89.

In People v. Mays, 188 Ill. App. 3d 974 (1989), relied upon by defendant in support of his argument here, the appellate court found that the trial court improperly denied the defendant's request to attempt to impeach Larry Wade, a police informant, when it refused to allow the defendant to present witnesses who would testify about Wade's prior suicide attempt. Mays, 188 Ill. App. 3d at 980-81. Wade had been asked on direct examination about an incident in which he was found in the jail hanging with a towel around his neck and he described this incident as a stunt and not a real suicide attempt. Mays, 188 Ill. App. 3d at 980-81. The trial

18

court was found to have abused its discretion by excluding impeachment testimony from Wade's prison cell mate and a prison guard that he had made an actual attempt to commit suicide as the jury should have been allowed to consider this evidence in order to determine the weight to give Wade's testimony. Mays, 188 Ill. App. 3d at 980-81.

This case is clearly distinguishable from Mays. Here, defendant was allowed to introduce evidence that the jury could consider when determining the weight to give Ginger's trial testimony. The defense was permitted to adduce evidence regarding the name of Ginger's diagnosed mental illness, the medications that she was prescribed by Dr. Schimel, the effects of not taking her prescribed medications, her incontinence at the time that she provided her statement to authorities, and the observations of Ginger's mother regarding her daughter on the day that Ginger provided her statement to ASA Black. We also note that this court previously concluded when reversing and remanding for a new trial that "although it was proper to allow Dr. Pan to testify regarding the medications that Altman was taking and the effects of those medications on her behavior, it was improper to allow expert testimony as to her competency." People v. Rush, No.1-00-3864, slip. op. at 21 (June 16, 2003)(unpublished order under Supreme Court Rule 23). The trial court was fully cognizant of this direction when denying defendant's request to admit into evidence Dr. Jones' protocol as to the cause of Ginger's death and specifically noted that it would lead back to having to admit Dr. Pan's opinion as to the witness's competency which was contrary to this court direction. Consequently, we find the trial court did not abuse its discretion by limiting as it did the evidence presented to the jury concerning Altman's psychiatric condition and the circumstances surrounding her death.

19

Defendant next contends that the trial court erred in allowing, over his objection, certain hearsay testimony of Sergeant Nowakowski under the guise of explaining the steps taken in his investigation. Specifically, defendant contends that his constitutional confrontation rights were violated when the sergeant was allowed to testify that after speaking with Detective Rose as well as with Henry and Mary Swek, he went to the crime scene armed with a specific description of the gender, weight, height, and hair color and texture of the alleged offender, including that he had a tattoo on his arm that spelled "Joe." The State argues that this testimony was not hearsay because it was not offered for the truth of the matter but, rather, to explain the steps taken in the police investigation leading up to defendant's arrest.

Courts have found that statement used to detail the progress of a police investigation are not offered to prove the truth of the matter asserted and, therefore, are not hearsay. People v. Armstead, 322 Ill. App. 3d 1, 12 (2001). Courts have warned, however, that the potential misuse of this exception is great and that an officer's testimony that he acted upon information received, or words to that effect, should be sufficient. People v. Sample, 326 Ill. App. 3d 914, 921 (2001). "Such a statement is admissible if offered for the limited purpose of explaining why the police conducted their investigation as they did or why they arrested defendant." Armstead, 322 Ill. App. 3d at 12. "Likewise, '[a] police officer may testify that a conversation with an individual took place and he acted thereon because such testimony is within the officer's personal knowledge' and is not hearsay." Sample, 326 Ill. App. 3d at 920, quoting People v. Pryor, 181 Ill. App. 3d 865, 870 (1989). "Where the trial court admits out-of-court statements for the limited purpose of explaining why the police acted as they did in their investigation, the court

must specifically instruct the jury that the statement is introduced for a limited purpose and that the jury is not to accept the statement for the truth of its contents." Armstead, 322 Ill. App. 3d at 12.

In Sample, relied upon by defendant, two police officers testified that after they spoke with the two codefendants, they began searching for the defendant. Sample, 326 Ill. App. 3d at 921-23. This court concluded that cataloging the repeated instances during which the jury was encouraged to infer that the two codefendants had implicated the defendant indicated that the State stretched the boundaries of the investigative procedure hearsay exception. Sample, 326 Ill. App. 3d at 924. In concluding that the testimony was improper and constituted more than simple police procedure, we found that the "the repetition of strong inferences that his codefendants implicated defendant in the crimes, the use of those statements to build a substantive link in the State's case, and the State's several comments on the upcoming testimony during opening statement, lead us to conclude that the boundaries set for the investigative process hearsay exception were breached." Sample, 326 Ill. App. 3d at 924.

In People v. Jura, also relied upon by defendant, the hearsay statements elicited by the State included testimony by three police officers that they responded to a radio dispatch of " 'a person with a gun,' described as 'a male White with a tattoo with a teardrop on his face,' and that defendant 'matched that description.' " People v. Jura, 352 Ill. App. 3d 1080, 1085-86 (2004). We found that the hearsay content of this radio call was inadmissible at the defendant's trial and that it did not meet the exception to the hearsay rule for investigatory procedure. Jura, 352 Ill. App. 3d at 1088. We found that the substance of the hearsay statements had the effect of

proving the matter asserted. <u>Jura</u>, 352 Ill. App. 3d at 1088. In rendering our judgment, we emphasized that the State repeated the statements during the examination of the officers and relied upon the statements in both opening and closing arguments to prove that defendant matched the description of the person with the gun, which was the essence of the dispute, whether the defendant was the man who possessed the gun. <u>Jura</u>, 352 Ill. App. 3d at 1088. In concluding that the hearsay was inadmissible and was used as substantive evidence to prove defendant guilty, this court specifically noted:

> "We emphasize that we could accept the State's argument that it used the hearsay merely to explain the investigation undertaken by the police had the State not elicited the hearsay repeatedly through the testimony of not one, but three witnesses; relied upon the hearsay in opening statement; relied upon the hearsay in closing argument; and repeated the 'fact' the hearsay description matched the defendant although the trial judge had sustained objection to this question and that 'fact' was not in evidence." <u>Jura</u>, 352 Ill. App. 3d at 1088-89.

In the instant case, unlike in <u>Sample</u> and <u>Jura</u>, the State did not elicit the hearsay at issue from any witness other than Sergeant Nowakowski and it did not repeatedly rely upon the hearsay evidence at trial  Consequently, in accord with <u>Jura</u>, we accept the State's argument that it used the hearsay merely to explain the investigation undertaken by police. While we recognize

that the trial court did not provide a limiting instruction to the jury as to the purpose of the testimony at issue, at no time did defense counsel request a limiting instruction and, therefore, the matter is waived. See Enoch, 122 Ill. 2d at 186.

Moreover, even if the admission of the hearsay description of the victim's assailant constituted inadmissible hearsay, we find the error was harmless beyond a reasonable doubt. See Sample, 326 Ill. App. 3d at 925 (the improper admission of hearsay evidence is harmless if there is no reasonable possibility that the verdict would have been different had the hearsay been excluded). In this case, Sergeant Nowakowski testified that after defendant was arrested in Marquette Park on September 23, 1997, defendant told him that on the evening of September 21, he had been in a fight in the park with an "old guy," and that his girlfriend, Ginger Altman, was with him at the time. Ginger testified that defendant was her boyfriend and that they were together in Marquette Park on the evening of September 21 when defendant was fishing and drinking with an older white man. Ginger further testified that the two men walked toward the older man's car and that defendant slapped and kicked the older man who ultimately fell to his knees. ASA Black testified that defendant told him that he had gone fishing in Marquette Park with the victim on September 21, and that he struck the victim twice in the head. The State introduced the victim's autopsy report, which concluded that the victim died as a result of craniocerebral injuries due to blunt head trauma and that the manner of death was homicide. ASA Black further testified that defendant told him that he took the victim's fishing poles because he thought that he deserved to be robbed and that he brought the fishing poles back to his house. The State admitted into evidence three fishing poles recovered from defendant's

home on September 23, 1997, which were identified at trial by the victim's sister as belonging to her brother.

Finally, we consider defendant's contention that the trial court interfered with his ability to knowingly exercise his constitutional right to testify by refusing to rule on his motion *in limine* to bar his prior conviction for aggravated criminal sexual assault unless and until he testified.

Our supreme court in People v. Patrick, 233 Ill. 2d 62, 73 (2009), addressed this issue that to preserve such a claim for appeal, the defendant must testify at trial. Patrick, 233 Ill. 2d at 73; see also People v. Calderon, 393 Ill. App. 3d 1, 11 (2009). Defendant in this case chose not to testify at trial and, therefore, in accordance with Patrick, his claim of error was not preserved.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HALL, P.J., and GARCIA, J., concur.