2021 IL App (1st) 191629-U

No. 1-19-1629

Order filed December 14, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 2536-01 |
| | ) | |
| TYDUS RANDOLPH, | ) | The Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

ORDER

¶ 1    *Held*: Even assuming the State's main witness improperly offered prior consistent statements in testimony, the evidence was not closely balanced and defendant was not prejudiced, nor was his counsel constitutionally ineffective. This court affirmed the judgment of the circuit court.

¶ 2    Following a jury trial, defendant Tydus Randolph was found guilty of domestic battery and sentenced to five years in prison. On appeal, he contends his conviction rests on the improper prior consistent statements and hearsay testimony of the State's main witnesses, all of

which amounts to prejudicial error and ineffective assistance of counsel requiring a new trial. We affirm.

¶ 3                              BACKGROUND

¶ 4      Defendant was arrested and then charged with aggravated domestic battery and domestic battery, among other offenses, after a 48-hour period in which he beat up Kiera Townsend, his then live-in fiancé of some two years and the mother of their young son.

¶ 5      Townsend testified that on January 20, 2018, as defendant drove Townsend and their three-month-old son to the currency exchange at 47th Street and Ashland Avenue, they entered into a verbal altercation. Defendant parked on 47th Street, and the argument continued for several hours, with defendant calling Townsend stupid. Eventually, Townsend exited the van and, as she reached for her baby in the backseat, defendant said, "Bitch, where you finna to go? You not gonna take my baby nowhere." Townsend insisted she would take her baby, but he said "Where the fuck do you think you're going?" The argument outside the van continued, and as Townsend attempted to remove her child, defendant then grabbed her, smacked her face and choked her, moving her towards the front passenger's seat. Townsend relayed she couldn't breath, but defendant repeated that she would not take the baby anywhere and threatened to kill her.

¶ 6      Townsend testified that around this time, a person walked past, since she could see through the back passenger door. She later learned it was a currency exchange employee, Vernon Bell. Townsend requested to use his phone, and Bell asked if Townsend was okay, then invited her inside the currency exchange to use the phone. She wanted to call someone about what happened between her and defendant. Defendant, abandoning their son in the car, followed them and attempted to persuade Townsend to leave. Defendant threatened Bell to stay out of his

"fucking business" or else Bell would "end up getting fucked up," but then also ordered Townsend to "get [her] baby" and belongings out of the apartment and "just get the fuck on." At that point, Bell left for the back room.

¶ 7    Bell also testified at trial corroborating that on the day in question around 9 p.m., he was returning to the currency exchange when he overheard a commotion and glanced behind him. From about 50 feet away, he noticed a male, who was defendant, make a jerking movement as he shoved a woman, who was Townsend, into a minivan with such force it made the van shake. Bell, who was Facetiming his girlfriend, relayed he thought there was an argument and watched the incident for some seconds. Just then, defendant looked in Bell's direction, and Townsend walked towards him. Bell offered Townsend his telephone and told her she "could step inside" the currency exchange, where he worked. Townsend and defendant followed Bell inside. Defendant stood between the two and told Townsend that Bell "needed to mind [his] own business." Bell proceeded to the back area, where he told his manager to call the police because he saw "someone being shoved into a car" and viewed it as an altercation.

¶ 8    The State published to the jury a surveillance video of the outside and inside of the currency exchange. The video depicts defendant standing between the Bell and Townsend and speaking to Bell. Defendant paces, appearing agitated, and Bell enters a back door. Defendant walks toward the entrance, but then returns to Townsend. He steps close to her, encroaching on her personal space in a menacing way as he points towards the entryway. He is so close to Townsend, she steps back several times. Defendant eventually walks out, and Townsend follows.

¶ 9    Meanwhile, at some point Townsend testified she had called her cousin for a ride, but he was unavailable, so she returned to defendant's apartment because he had told her she could "get her baby." There, she grabbed the necessary belongings and informed defendant she would go to

her mother's. Defendant responded, "You're not taking my son over there," they argued, and then defendant charged at Townsend, pushed her against the wall, and smacked her face.

¶ 10   Noting a mark by the side of her eye that was swelling, Townsend telephoned her mother. After that, defendant, who was upset that she phoned her mother, punched her in the right jaw, nose, and lip. Townsend cried, and defendant asserted she was "trying to take" his baby around "them people" (meaning her family) and punched her in the forehead some five times, thereby creating marks. Townsend called her mother again, but defendant snatched the phone and yelled that Townsend was "trying to have them people come to my house," and to make him lose his apartment. He told Townsend to "get the fuck out" even though moments later as she grabbed her belongings he contrarily told her "you're not going nowhere," and to sit her "stupid ass down." When Townsend attempted to leave the bedroom, defendant punched her in her right eye. Defendant then calmed and told her he loved her, he wanted his family, and asked her if she still wanted to leave. She replied she did, and defendant became irate. She grabbed her son, they argued, and defendant then punched her while stating "bitch, you better not drop him." She fell on the bed, and he punched her in the forehead again.

¶ 11   Townsend lay the baby down and attempted to call her mother again, but defendant took her phone, hit her in the back of the head with a broom and said, "Bitch I'll kill you. I'll beat your brains out." Townsend snatched the broom and swung it, also creating a mark on defendant's face, but defendant took the broom back and said, "All right, bitch. *** Do you want to fight?" Townsend's father subsequently called her, but defendant took Townsend's phone. He told her not to give their address because she was going to "get him locked up." As she then left the apartment, defendant repeated that they were supposed to be a family and they needed to "just sleep" and put the matter behind them. However, when she went back inside, defendant

punched her in the forehead, knocking her down and kicked her in the left arm and choked her as she lay on the floor. Defendant beat her throughout the night. The two had only been in their apartment about a week, and her parents did not know the address. According to Townsend, defendant also would not let her call the police. At one point, as Townsend cried, defendant noted she had to work the next day at Dunkin' Donuts, he called her "babe," and offered to get some ice for her swollen face. He again said they needed to "put this in the past."

¶ 12     That morning, Townsend decided not to work and texted her boss that she "needed help" and said that her son's father had "beat [her] all night." She also sent her boss photos of her face, but she quickly erased the message in case defendant grabbed her phone. Following this testimony, the court sustained the defense's objection. Townsend then left the apartment as if she were going to work, got in the van, and immediately called the police. She ultimately relayed the events, and requested that police come without sirens because she didn't know how defendant would react or "what he would do with" her baby. In addition, when police arrived, they saw her face and one said, "I hope this is it. And he just said he's going to wait for - -," at which point defense counsel objected, and the objection was sustained. Police accompanied Townsend back to the apartment, where she knocked on the door while officers stood aside. Defendant opened the door, asked Townsend why she wasn't at work, and she placed her foot inside as defendant tried to close the door. Police then arrested defendant and took photographs of Townsend's injuries. They also took photos and a video two days later, on January 22.

¶ 13     These images were published to the jury, and Townsend testified to the injuries that resulted from the battery, including bruises and knots on her forehead, and scratches and/or bruises on her lip, cheeks, temple, neck, elbow, fingers, and the back of her head. She had a broken, bloody, swollen nose, and her ear and brow were "busted," meaning bloody. The photos

taken two days after the incident also showed swelling and bruising, specifically of her face and around her eyes, as having "set in." In spite of these injuries, Townsend acknowledged writing defendant letters thereafter and visiting him in jail twice and testified that she still loved him.

¶ 14    Chicago Police Officer Matthew Ruppert testified that he and his partner responded to a "domestic service call," and on seeing Townsend, found she was very distraught, "shaken up," and had a large contusion on her forehead. Townsend and the officers proceeded to the apartment, where Townsend knocked on the apartment door while the officers stood aside because she feared defendant wouldn't open the door if he saw the officers. When defendant opened the door, he was arrested. The State published the body camera of another officer present at the scene, which was consistent with Officer Ruppert's testimony.

¶ 15    Trial evidence further revealed that in April 2019, some four months after the domestic disturbance, and while defendant was in jail, he called his sister. In the recorded conversation, published to the jury, defendant asks her to secure an affidavit from Townsend recanting the abuse allegations. Defendant states that his "life is on the fuckin' line with this bitch," and asks that Townsend in the affidavit simply state:  she was in a "jealous rage," she was "was mad," and "thought he was cheatin' on [her]," so she "got jealous" and "that didn't really happen." He asks that the affidavit be sent to his judge and asserts the State would then drop the case against him because Townsend's "statement will be discredible. I know the law." He again states that his life is on the line and repeatedly refers to Townsend as a bitch. Following this evidence, the State then rested its case.

¶ 16    Defendant testified on his own behalf that it was Townsend who was the aggressor in the relationship. On the day in question, as the two drove to the currency exchange, Townsend asked defendant if he thought her to be "stupid," to which he responded sarcastically, and she began

"cursing and hollering and being disrespectful." When they arrived, defendant received a telephone call from his female friend, then he exited the van, and Townsend "charged" at him "swinging, cussing," and inquiring "who was that bitch on the phone." Townsend punched defendant in the face and attempted to wrest his phone from him. Townsend followed him as he returned to the van still "yelling, cursing, being adamant" about the female caller. She never leaned into the car and attempted to take the baby out.

¶ 17    Townsend exited the van again and entered the currency exchange. Defendant followed attempting to explain that the female was just a friend. Other than the currency exchange employee's compliment to defendant's Looney Tunes jacket, defendant and the employee had no interaction. Defendant ultimately waited by the van and when Townsend returned, said she needed "to get her things and leave" the apartment. Defendant denied choking or striking her at that time. Townsend exited the van with their child and began walking along Ashland Avenue. The two eventually returned to the currency exchange. He drove away but then pursuant to her call, returned to pick her up and they returned to the apartment. Defendant told her to take the baby and leave, but Townsend became angry and refused.

¶ 18    Defendant's female friend called, and Townsend charged into the room in a rage swinging at him and asked who was that "bitch" on the phone. She smacked defendant's phone from his hand and swung an empty liquor bottle at his face. He blocked it, took the bottle and threw it in the closet. Townsend ran to the kitchen and returned with a mop and hit defendant in the right forearm. He grabbed it, and she then returned from the kitchen, only this time with a broom, swinging it at defendant. He also took the broom. Townsend eventually calmed after the two spoke with her mother, and defendant prepared the baby for sleep and then dozed with the baby next to him as Townsend sat on the edge of the bed giving him an "evil look."

¶ 19     Defendant denied striking Townsend or choking her and testified he never saw her injured in any way. He did not leave a mark on Townsend's forehead, temple, nose, or mouth or cause her nose and mouth to bleed; similarly, defendant did not know how the forehead mark appeared. He only grabbed her hands to calm her down. Rather, he insisted he was injured in the jaw during the altercation. He acknowledged he possibly called his sister from jail attempting to have Townsend prepare an affidavit because he claimed "she didn't want anything else to do with the case." Defendant explained he wanted Townsend to tell the truth in the affidavit, meaning that she had gotten mad and believed he was cheating on her. Defendant asserted Townsend visited him in jail and said she would accept money to prepare the affidavit. He acknowledged he intended to pay her for the affidavit, and believed it was "perfectly legal" to do so. He did not want her coming to court, yet denied that he wanted Townsend to lie in the affidavit. Defendant acknowledged he was previously convicted of armed robbery and a weapons offense.

¶ 20     Following evidence and argument, the jury deliberated for about six hours. During that time, it sent six notes. The first asked whether, in order to be found guilty of aggravated battery, a defendant must also be found guilt of battery; the second asked if jury members could view the police video camera again; the third asked for a definition of reasonable doubt; the fourth asked for a transcript of the State's Attorney's argument defining domestic battery, as well as Bell's transcript; the fifth asked about the time schedule for the jury members if they could not reach a unanimous verdict. The court allowed the jury to rewatch the police video camera and sent back only Bell's transcript. In addition, the court referred the jury to the instructions and asked them to continue deliberating, adding "[w]e will make available to you whatever time you need to reach a verdict." Last, in the sixth note, sent around 4 p.m., the jury essentially asked to stop at 5:30

p.m. and resume on Monday. The court responded that the jury should continue to deliberate and if necessary reconvene on Monday. Nevertheless, at 4:30 p.m., the jury reached a verdict. It found defendant guilty of domestic battery (Count 6), although not guilty of aggravated domestic battery predicated on strangulation (Count 1), and defendant was sentenced to five years in prison. Defendant appealed.

¶ 21                                ANALYSIS

¶ 22    Defendant first contends the State improperly bolstered Townsend's testimony through multiple prior consistent statements. The State responds that defendant forfeited this matter by failing to raise it in a posttrial motion. See *People v. Thompson*, 2015 IL App (1st) 122265, ¶ 34 (noting that a defendant must object contemporaneously and in a posttrial motion to preserve an issue for review). While defendant acknowledges forfeiture, he maintains we may review the case pursuant to the plain error doctrine because the evidence was closely balanced. See *id*.; *People v. Williams*, 147 Ill. 2d 173, 226-27 (1991) (courts may take cognizance of an issue via the plain error rule despite a defendant's failure to object at trial and in a written posttrial motion). However, in the absence of any error, there can be no plain error, so we begin by considering whether any error occurred with respect to Townsend's claimed prior consistent statements. See *Thompson*, 2015 IL App (1st) 122265, ¶ 34.

¶ 23    Generally, a prior consistent statement made by a witness constitutes inadmissible hearsay, which cannot be used to bolster a witness's testimony or unfairly enhance the credibility of the witness. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60; *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99; see also *People v. Lawlor*, 142 Ill. 2d 548, 557 (1991) (noting that hearsay is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within an exception). Prior consistent statements create a danger

insofar as a jury is likely to attach disproportionate significance to them because people tend to believe that which is repeated most often. *Johnson*, 2012 IL App (1st) 091730, ¶ 60. However, credibility should not depend upon the number of times a witness has repeated the same story, as opposed to its inherent trustworthiness. *People v. Lambert*, 288 Ill. App. 3d 450, 457 (1997). An exception to the rule barring prior consistent statements is if such statements are introduced to rebut an allegation that the witness was motivated to testify falsely, or otherwise to rebut an allegation of recent fabrication. *Johnson*, 2012 IL App (1st) 091730, ¶ 61. However, such a prior consistent statement is permitted solely for rehabilitative purposes and not as substantive evidence. *Lambert*, 288 Ill. App. 3d at 457.

¶ 24    Defendant complains of Townsend's testimony on direct examination. He maintains the first prior consistent statement occurred when the State asked Townsend what she did instead of going to work the morning after the altercation, and she responded:

> "I text my boss. I sent him - - I told him that I needed help. I asked him can he please help me. I told him my son's father had beat me all night. And I sent the pictures of my face.
>
> Once I did that, I hurried up and erased it just in case if [defendant] grabbed my phone so he wouldn't see it. So I sent him the pictures and then I text him. And then after that, he said - - he said, What happened to you? And he said that - -[.]"

¶ 25    Defendant maintains the second prior consistent statement occurred after Townsend left in the van and called the police. She testified, "I called the police. I was talking to the police officer. I was telling him what happened with me and I was asking them to please come, but don't have no sirens on or none of that because I don't want him to hear the police or none of that because my son is still up there and I don't know what he would do with my baby."

¶ 26    And, finally, defendant maintains the third prior consistent statement occurred when she testified that when the police arrived, "[t]hey saw my face and he just was like, I hope this is it. And he just said he's going to wait for - -[.]"

¶ 27    Defendant writes, the "incessant repetition via consistent statements that [he] was the offender, the aggressor, and a danger to his own son was improper" and prejudicial. In response, the State does *not* argue the well-known exception to the rule for prior consistent statements, cited above, nor can we discern its application since there was no motive to testify falsely or charge of recent fabrication that arose after the incident. See *Johnson*, 2012 IL App (1st) 091730, ¶ 61 (noting that to qualify for this exception, the prior consistent statement must have been made before the alleged motive to testify falsely or the alleged fabrication). Rather, the State maintains Townsend's aforementioned testimony does not even constitute a prior consistent hearsay statement because in each instance the statements were offered for their effect on the listener or to explain the subsequent course of Townsend's conduct. See *People v. Carroll*, 322 Ill. App. 3d 221, 223 (2001) (noting that such statements are not hearsay). Thus, the statements were not offered for the truth of the matter asserted, that defendant beat Townsend and she was fearful of him as a result. See *id.*

¶ 28    We reject the State's argument out of hand. For example, that Townsend feigned going to work did not necessitate relaying she texted her boss that defendant beat her all night. Nor did it necessitate relaying she sent her boss photos of her beaten face and then erased them. Likewise, that Townsend called the police and requested assistance did not necessitate telling police to arrive without sirens because she was fearful for her son because of defendant. In other words, Townsend's testimony was above and beyond what was necessary to describe her course of conduct or the effect on the listener to satisfy the hearsay exception.

¶ 29    Nonetheless, for the reasons to follow we find no basis for reversal. Following the first and third statements, the defense objected, and the court sustained the objections. The court later instructed the jury members that they "should disregard questions which were withdrawn or to which objections were sustained." Contrary to defendant's contention, these statements were not submitted as substantive evidence of defendant's guilt, as they were completely stricken. Where a timely objection is made and the court sustains the objection or instructs the jury to disregard the answer, any arguable error can usually be cured. *People v. Fierer*, 260 Ill. App. 3d 136, 146 (1994); see also *People v. Edwards*, 309 Ill. App. 3d 447, 455-56 (1999) (noting that the sustaining of defendant's objections and the giving of the instruction to the jury cured any arguable errors). Thus, those two statements did not bolster Townsend's testimony, as they were not even in evidence, a fact defendant declines to recognize. Moreover, the police officer's statement on seeing Townsend's face, "I hope this is it," is not entirely clear. While one might infer he believed her injuries to be severe, we do not know what "this" or "it" refers to or what his exact hope is.

¶ 30    As to the second statement, while improper for Townsend to testify she told officers to arrive absent sirens due to her fear of defendant with the baby, it certainly did not rise to the level reversible or plain error. The most critical fact in determining the degree to which a prior consistent statement deprived a defendant of a fair trial is whether the statement itself had a bearing upon his guilt or innocence. *People v. Smith*, 139 Ill. App. 3d 21, 34 (1985). While Townsend's statement conveyed her fear and distrust of defendant, especially with respect to his care for their child, it did not bear directly on the issue at hand:  whether he grabbed, struck, and beat Townsend (with whom he had a dating or engagement relationship) throughout the evening in question, thus causing her bodily harm. See 720 ILCS 5/12-3.2(a)(1) (West 2018) (noting that

a person commits domestic battery if he knowingly without legal justification causes bodily harm to any family or household member); *cf. Smith*, 139 Ill. App. 3d at 34 (finding that in a murder trial, a questionable witness' statement to another that the defendant had shot the victim bore directly on the defendant's guilt). Other factors militate against a finding that the improperly admitted evidence affected the case's outcome. See *People v. Miller*, 302 Ill. App. 3d 487, 493-94 (1998) (noting factors). For example, defendant fails to demonstrate this statement was mentioned in opening or closing argument; the statement instead was merely cumulative of Townsend's claim that defendant lacked due care for the baby; the statement was attested to by the party who made the statement (Townsend) rather than a third party, creating less damage; and the evidence was not closely balanced, as discussed immediately below.

¶ 31   For first-prong plain error, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Prejudice rests not on the seriousness of the error but on the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 68. "An error is prejudicial because it occurred in a close case where its impact on the result was potentially dispositive." *People v. Lee*, 2019 IL App (1st) 162563, ¶ 67. The burden of persuasion remains with the defendant. *Id.* In determining whether the closely balanced prong has been met, we must make a "commonsense assessment" of the evidence within the context of the circumstances of each individual case. *People v. Adams*, 2012 IL 111168, ¶ 22. As such, we must assess the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility. *Lee*, 2019 IL App (1st) 162563, ¶ 67.

¶ 32   Here, Townsend's testimony that the abuse began at the currency exchange was corroborated by its employee, Bell. Like Townsend, Bell testified that he invited Townsend into

the currency exchange after seeing defendant shove her into the car, and Bell was essentially threatened by defendant "to mind [his] own business." Bell testified this altercation was serious enough to prompt him to direct his boss to call the police. The video corroborated their testimony and showed defendant conducting himself in a menacing fashion. While the jury acquitted defendant on the charge of aggravated domestic violence, apparently determining the evidence insufficient to find defendant strangled Townsend, the jury was not precluded from considering the currency exchange testimony and video as buttressing Townsend's overall account of the events that night.

¶ 33     Likewise, Townsend's testimony that defendant later knowingly caused her bodily harm by repeatedly beating her was also validated by the photos taken after the incident and entered into evidence at trial, which showed bruises and knots on her forehead, and scratches and/or bruises on her lip, mouth, cheeks, arm, fingers, and the back of her head. See 720 ILCS 5/12-3.2(a)(1) (West 2018). She had a broken, bloody, swollen nose, and her ear and brow were "busted," meaning bloody. The photos taken two days after the incident showed swelling and bruising, specifically of her face and around her eyes, as having "set in." Police verified that on responding to Townsend's call, they found her distraught, shaken up, and with a large contusion on her forehead. Townsend's credibility was further enhanced by the recorded jailhouse call and testimony revealing defendant attempted to pay Townsend off in exchange for her affidavit recanting her abuse allegations so that defendant could avoid prison (a matter Townsend testified he was specifically concerned about during the altercation at home). Thus, Townsend's testimony was corroborated by two witnesses, as well as photographic, video, and sound record evidence.

¶ 34    On the other hand, defendant's testimony not only lacked corroboration but was utterly implausible. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 87 (noting that evidence is not "closely balanced" whenever the defense's version of events differs from the State's version, especially where the defendant's version of events strained credulity); *People v. Williams*, 209 Ill. App. 3d 709, 721 (1991) (noting that "[w]hen a defendant elects to explain the circumstances of what has occurred he is bound to tell a reasonable story or be judged by its improbabilities."). First, defendant testified that at the currency exchange his only interaction with Bell occurred when Bell complimented defendant's Looney Tunes jacket. This directly contradicted Bell's testimony and lacked any further support. Second, defendant's testimony that it was Townsend who beat him in a jealous rage likewise lacked any corroboration in the form of text, email, or photographic evidence. His testimony that he never saw Townsend injured in any way and that he merely grabbed her hands to calm her also contradicted the photos showing her injuries and was therefore incredible. Finally, his denials about the jailhouse call and proposed affidavit defy belief; evidence showed he thought his freedom more important than the crime he committed.

¶ 35    Therefore, this case did not present a credibility contest, as defendant argues. *Cf. Sebby*, 2017 IL 119445, ¶¶ 61-62 (finding evidence closely balanced where the State's witnesses and defendant's version of events were equally consistent and neither account was fanciful or supported by corroborating evidence). While defendant attacks Townsend's credibility because she did not call 911 soon enough or ask her family to intervene, and he maintains this rendered her account implausible and the evidence closely balanced, we find such behavior actually supports Townsend. It's common knowledge that many victims of domestic violence live with abuse long before getting help. Regardless, Townsend testified that defendant repeatedly took her phone when she spoke with her parents or was about to, he threatened her, and he beat her

thereafter. Her parents did not know her new address, and defendant also would not allow her to call police. The very hearsay principles defendant now complains about precluded Townsend from testifying about the specific content of her conversations with her parents. Defendant's assertion also does not take into account the physical evidence identified above. In short, a common sense evaluation shows the evidence most certainly was not closely balanced such that any error threatened to tip the scales of justice against defendant.

¶ 36    Citing *Lee*, 2019 IL App (1st) 162563, ¶ 67, defendant also argues the jury notes here reflect its struggle to reach a verdict and the closely balanced nature of the evidence. In *Lee*, this court found that lengthy, 10-hour-long jury deliberations lasting until the next day, paired with notes demonstrating the jury had reached an impasse, supported the closely balanced nature of the evidence. *Id.* ¶ 67. Significantly, apart from the jury deliberations, *Lee* also found the evidence was in fact closely balanced because both the State and the defendant's versions were plausible without any extra corroboration. *Id.* ¶¶ 69-70.

¶ 37    Here, in contrast, the jury never indicated it had reached an impasse, and it reached its guilty verdict as to Count 6, domestic battery, by day's end. As set forth, the evidence itself also was not closely balanced. The most that can be said is that the jury notes *might* reflect closely balanced evidence as to Count 1, aggravated domestic battery predicated on strangulation. The State alleged that in the van by the currency exchange and at the apartment, defendant had choked Townsend. Consistent with its notes and deliberations, the jury ultimately acquitted defendant on that count, but then found him guilty of domestic battery.[1] See *People v. McBride*,

---

[1] Defendant maintains that we must discount Bell's testimony and find Townsend incredible because the jury acquitted him of Count 1. In that count, the State alleged that defendant committed aggravated domestic battery in that he strangled Townsend by grabbing her about the neck and impeding her breathing while she and defendant had a dating or engagement relationship. Townsend testified that defendant choked her by the currency exchange and also in the apartment. Contrary to defendant's

2020 IL App (2d) 170873, ¶¶ 42-43. Regardless, defendant fails to cite any case supporting the notion that jury notes and long deliberations *alone* can demonstrate evidence is closely balanced. Such a principle would be too speculative (see *People v. Johnson*, 408 Ill. App. 3d 157, 172-73 (2010)), where it's commonplace for juries to request a definition of "reasonable doubt" (see *People v. Downs*, 2015 IL 117934) and the notes might simply reflect a "holdout juror" (see *People v. McCoy*, 405 Ill. App. 3d 269, 278 (2010)).

¶ 38    Defendant also complains that Officer Ruppert's testimony on direct examination was impermissible hearsay. Defendant cites as improper Officer Ruppert's testimony that he proceeded to the apartment because "Ms. Townsend said that's where the *offender* was (emphasis added)." Defendant also complains about Officer Ruppert's testimony that when responding to the domestic violence call, Townsend first knocked on the apartment door as the two officers stood aside because Townsend "was fearful that if" defendant saw police, "he wouldn't open the door."

¶ 39    The State responds that these statements fall under the course-of-investigation exception to the hearsay rule, which permits statements detailing the progress of a police investigation and why police arrested a defendant or took other action. See *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23; *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010). Such testimony is not hearsay, because it's offered to show the steps an officer took rather than for the truth of the matter asserted. *Id*. We agree with the State that Officer Ruppert's statements were merely intended to convey his course of investigation and why officers declined to knock and announce their presence at the apartment door, as is customary. This evidence thus satisfied a relevant

contention otherwise, an acquittal of Count 1 did not diminish testimony by Townsend, corroborated in part by Bell, that defendant shoved and beat her that evening, causing bodily harm (Count 6). It simply meant the jury found the evidence that defendant specifically strangled her to be insufficient.

nonhearsay purpose. See *People v. Jura*, 352 Ill. App. 3d 1080, 1086 (2004). The passing

reference to defendant as the "offender" was not unduly prejudicial, as it was clearly a synonym

for "defendant" or "the accused" and also served to explain the progress of the police

investigation after conversing with Townsend.

¶ 40    Defendant, moreover, has not shown the State repeatedly relied on these statements

during argument, or that they directly reflected the essence of the dispute:  whether defendant

beat Townsend. *Cf. Jura*, 352 Ill. App. 3d at 1086-89 (finding reversible error where the State

repeatedly relied on police hearsay statements of a radio call that the defendant matched the

description of the person with the gun, which was the essence of the dispute). Defendant likewise

did not seek any limiting instruction, asking the jury to consider the statements for their limited

purpose and not the truth of their contents, thus waiving that matter. See *Rush*, 401 Ill. App. 3d at

15-16. These statements by the police investigating the scene were not hearsay and therefore

were not error, nor did they improperly corroborate Townsend's testimony. However, even if

they did flirt with error, for the reasons stated above, they did not constitute plain error because

the evidence was not closely balanced.

¶ 41    Last, defendant argues his counsel was constitutionally ineffective for failing to object to

the various statements (only one of which we have found came close to error). Under *Strickland

v. Washington*, 466 U.S. 668 (1984), a defendant must demonstrate both that counsel's

performance fell below an objective standard of reasonableness and that there is a reasonable

probability that, but for those unprofessional errors, the result of the proceeding would have been

different. *People v. Dupree*, 2018 IL 122307, ¶ 44. Notably, plain-error review under the closely-

balanced-evidence prong is similar to an analysis for ineffective assistance of counsel based on

evidentiary error, insofar as a defendant in either case must show he was prejudiced. *People v.*

*White*, 2011 IL 109689, ¶ 133. Given that defendant cannot establish plain error prejudice because the evidence here was not closely balanced, he likewise cannot establish *Strickland* prejudice, and his claim therefore must fail.

¶ 42    To the extent the parties raise additional arguments, our holding disposes of the need to address them.

¶ 43                                  CONCLUSION

¶ 44    For the reasons stated, we affirm the judgment of the circuit court.

¶ 45    Affirmed.