2022 IL App (1st) 200010-U

No. 1-20-0010

Order filed February 10, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 13298 |
| | ) | |
| DAVIS ARNA, | ) | Honorable |
| | ) | William G. Lacy, and |
| Defendant-Appellant. | ) | William G. Gamboney, |
| | ) | Judges, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Defendant's conviction and sentence are affirmed where: (1) defendant has failed to establish plain error in the admission of testimony by two detectives, and (2) defendant has failed to establish that he was denied the effective assistance of counsel.

¶ 2     Following a jury trial, defendant Davis Arna was convicted of first-degree murder and found to have personally discharged a firearm that proximately caused death to another individual.

Defendant was sentenced to 23 years' imprisonment on the first-degree murder charge and a consecutive 25-year mandatory firearm enhancement for discharging a firearm that proximately caused death, for a total sentence of 48 years.

¶ 3 On appeal, defendant alleges that: (1) the trial court erroneously admitted hearsay statements made by the decedent to the police, and (2) he was denied the effective assistance of counsel based on trial counsel's failure to object to the admission of identification evidence by the decedent and remarks made by the State during closing argument.

¶ 4 For the reasons that follow, we affirm.

¶ 5                                     I. BACKGROUND

¶ 6                                  A. Pretrial Proceedings

¶ 7 Defendant filed a motion *in limine* to bar the State from introducing evidence of two statements made by the decedent to the police on May 20, 2013, and the decedent's identification of defendant as his assailant on May 26, 2013. Defendant maintained that the decedent's statements were inadmissible hearsay. Defendant further argued that the decedent's May 26, 2013, identification should be excluded where it was not recorded in any fashion and should have been the subject of a video deposition.

¶ 8 The State maintained that the decedent's oral statements of May 20, 2013, were admissible as excited utterances. With respect to the decedent's viewing of a photo array on May 26, 2013, the State did not intend to elicit the fact that the decedent nodded "yes" when shown a picture of defendant. Rather, the State sought only to elicit testimony that established the police officers' course of investigation. Defense counsel replied that course-of-investigation testimony was improper if it permitted the jury to infer that the decedent identified defendant as the offender.

¶ 9 The trial court[1] found that the decedent's statement to the initial responding officer, Officer Margret Susnis, was made after a sufficiently startling event to produce a spontaneous and non-reflective statement. The statement was made two to three minutes after the decedent was shot and provided little time for him to fabricate. The statement also related to the shooting.

¶ 10 The trial court found the decedent's statement to Detective Christopher Tenton at Advocate Christ Hospital two hours after he was shot also admissible as an excited utterance. The court found that this statement, which was made while the decedent was being treated and prepped for emergency surgery, was made "while the excitement of the shooting was predominant." The court concluded that "the circumstances surrounding these initial statements bear a great indicia of reliability."

¶ 11 Regarding the photo array shown to the decedent one week later, the trial court ruled in defendant's favor, finding that the decedent's act of nodding his head was hearsay and not subject to exception. As such, it would not be allowed in evidence. However, the State would be permitted to present police testimony that apprised the jury of the course of their investigation, including the fact that the police showed the decedent a photo array and any other investigatory steps that resulted in the police looking for defendant.

¶ 12 The trial court rejected defendant's reliance on *People v. Wheeler*, 186 Ill. App. 3d 422 (1989), finding it to be inapposite. The court maintained that its ruling comported with *People v. Ochoa*, 2017 IL App (1st) 140204, and relied on *People v. Simms*, 143 Ill. 2d 154 (1991), to support

---

[1] Judge William G. Lacy ruled on the pretrial motions in this matter. Judge William G. Gamboney presided over the trial.

the proposition that course-of-investigation testimony is admissible even if it suggests that the declarant implicated defendant. The court clarified its ruling:

"THE COURT: In this case what I am allowing, just so we are clear, is for the State to introduce that the police talked to the complaining witness, that they showed him a photo array, they are not going into how the photo array – they will not be allowed to go into how the photo array was [displayed], just what a photo array is and that they showed the complaining witness a photo array and that, in conjunction with all the other things they did, their interviews with other witnesses and things of that nature, whatever that investigation is, after that investigation was completed they were looking for your client.

That is the extent of what I have allowed into evidence. I believe it is supported by the law, including the case law, the *Ochoa* case which you have presented to me, Mr. Gorelick."

¶ 13                                   B. Evidence Adduced at Trial

¶ 14    On May 20, 2013, Adrienne Michelle Newbern resided with her boyfriend of 18 years, decedent Maurice Wooden, who went by the nickname "Marcus," in a third-floor apartment at 9625 South Halsted Street. The two had lived in the apartment for five or six months on this date.

¶ 15    The third floor of the apartment building had multiple tenants who rented out individual bedrooms that had separate locks. The tenants of the third-floor apartment shared the kitchen, dining area, and bathroom. Trinika Esco, her daughter, Serenity, and Mark Hegwood rented another bedroom in the third-floor apartment. They knew decedent by the nickname "Red."

¶ 16    Newbern testified that she had three other boyfriends in addition to the decedent: Leonard Green, Leonard Clark, and defendant, whom she only knew as "D." The decedent knew about Newbern's other relationships. Newbern testified that before May 20, 2013, defendant visited her at the apartment on multiple prior occasions. Newbern further testified that Esco and Hegwood had both previously met defendant.

¶ 17    On May 20, 2013, Newbern arrived home from work between 7 and 7:30 a.m. She and the decedent fought when he told Newbern they were being evicted. The decedent did not pay the landlord for rent and storage, despite Newbern giving him money to do so. A fight ensued which was both verbal and physical. The decedent struck Newbern, but Newbern did not strike him.

¶ 18    Newbern testified that the decedent left the apartment, and she called the police to see what could be done to prevent her from being evicted. The police told her that nothing could be done until the landlord actually moved her out of the apartment.

¶ 19    The argument resumed when the decedent returned to the apartment later that afternoon. The decedent went to the kitchen and prepared something to eat. Newbern remained in the bedroom and called defendant on the phone. Newbern told defendant about the eviction and the police response to her inquiry about what she could do to prevent being illegally evicted. Newbern testified that defendant became upset because he believed that the decedent was mistreating Newbern.

¶ 20    Newbern and the decedent continued fighting and arguing. Newbern ran to the bathroom and again spoke with defendant on the phone. Defendant told Newbern that he was at the "herbal place" paying a light bill. Newbern explained that the "herbal place" was "a place where you go

where they help you pay – at that time, they only help you pay your light or your gas." The store was on the same street as Newbern's apartment building.

¶ 21     Newbern testified that her phone suddenly disconnected, and she heard the decedent say, "[o]h, what the f***." This was followed by the sound of seven or eight gunshots. When Newbern opened the bathroom door, she saw defendant standing outside her bedroom door holding a gun. The gun was pointed at the door. Newbern said, "[n]o, no, no," and asked defendant, "[w]hat the heck, what you doing?" Defendant did not respond. Newbern saw holes in the bedroom door.

¶ 22     Newbern ran downstairs, and when she went outside to the alley, she saw defendant's parked car. Newbern jumped in on the passenger side, slid over to the driver's side, and attempted to drive away, but she did not know how to drive. As Newbern was trying to drive the car, she looked up to see defendant opening the driver's side car door. Newbern then slid back over to the passenger seat. Defendant drove the car out of the alley and told Newbern, "now you see what happened to him, the same can happen to you." Newbern believed defendant because he belonged to a group called the "Masons." Newbern testified that the Masons were dangerous people.

¶ 23     Defendant drove Newbern to her sister's house. Newbern then called Green, who picked her up in a green four-door Ford and drove her back to the apartment. When Newbern arrived at the apartment, she was arrested. Newbern testified that she lied to the police, denying that she was at the apartment when the shooting occurred. Newbern testified that she did not tell the police what happened because she was scared of defendant and his "crew."

¶ 24     Trinika Esco testified that she heard the decedent and Newbern arguing on the morning of May 20, 2013. Later that day, at about 1:30 p.m., while Esco and Serenity watched television, Hegwood came home from work. As Hegwood removed his work boots, Esco heard noises that

sounded like gunshots and a person saying, "[n]o, no, no." Hegwood told Esco and Serenity to get down on the floor. Hegwood looked out the apartment window and then opened their bedroom door. The back door of the third-floor apartment that led to the rear of the building was open. Hegwood told Esco and Serenity to stay inside the apartment and to stay down. He also instructed Esco to call the police and an ambulance.

¶ 25    While Esco called the police, she heard Hegwood yelling, "Red been shot. Red been shot." Esco ran outside with Serenity and flagged down a female police officer.

¶ 26    Esco testified that in the past, a male visitor picked up Newbern outside the apartment building and drove her to work when the decedent was at his job. She identified this person in open court as defendant. On one prior occasion, defendant drove Esco and Newbern to a liquor store.

¶ 27    Esco identified a photograph of a car, later established to be defendant's vehicle, as the car that was always parked in front of their apartment building when defendant gave Newbern a ride to work.

¶ 28    Esco testified that she provided the police with a description of defendant as dark-skinned, 6'2", approximately 160 pounds, lanky and skinny, and having an eye that made him appear to have had a stroke. She described defendant's car as tan and bearing a Mason sign. On cross-examination, Esco admitted that she described defendant as being 130 pounds and as having a mustache and being between 6'0" and 6'1". The weight description was a "guess" based on defendant being small and skinny and lanky and tall. Esco clarified that defendant had "a little fuzz," which she described as a mustache.

¶ 29    Esco denied telling two detectives that she saw the decedent lying on the floor bleeding.

¶ 30    Mark Hegwood testified to the layout of the apartment building at 9625 South Halsted Street. The building had a front and rear entrance. The rear entrance abutted an alley. The third-floor apartment had four bedrooms that had individual locks. The third-floor tenants shared the bathroom and kitchen. Hegwood and Esco's apartment had two windows. One faced the alley while the other faced the house next door.

¶ 31    On May 20, 2013, Hegwood, Esco, and Esco's daughter had lived at 9625 South Halsted Street for a couple of months. The decedent and Newbern moved into the apartment after Hegwood and Esco. That day, Hegwood, who worked at a waste management company in Crestwood, Illinois, arrived home at about 1 p.m. Before entering his bedroom, Hegwood saw the decedent cooking in the kitchen.

¶ 32    When Hegwood sat down and began taking off his shoes, he heard "scuffling" that sounded like someone was fighting in the middle of the apartment. Hegwood put his shoe back on and heard gunshots as he went to the door. He told Esco and her daughter to get into the closet, locked their door, and dropped to the floor. Hegwood heard four gunshots followed by a pause, after which he heard four more gunshots. He then heard the sound of two sets of footsteps running past his bedroom to the apartment's back door. Hegwood waited a few seconds before looking out the window where he saw a beige Mercury Marquis bearing what appeared to him to be a cancer ribbon on it, parked in the alley. Hegwood testified that he saw this same car parked in the side driveway of the apartment building on four or five prior occasions. Hegwood was familiar with the person who drove this car, whom he identified in court as defendant. Defendant previously saw Newbern being driven by defendant in this car. In the past, Hegwood also saw defendant in the third-floor apartment and had said hello or goodbye to him.

¶ 33     As he looked out of his bedroom window, Hegwood saw defendant run to the back of the Marquis, throw something into the car's open trunk, and enter the driver's side of the vehicle. Hegwood heard the sound of two doors closing but could not see the person who entered the passenger side. The car then headed southbound down the alley.

¶ 34     Hegwood told Esco that he was going to see what had happened. He left their apartment and observed that the decedent's bedroom door was kicked in and had four bullet holes in it. The decedent was lying in the middle of the doorway. Blood was on the floor. The decedent told Hegwood that he was hurt. Hegwood went back to his bedroom and told Esco to call an ambulance. Hegwood told Esco that he would stay with the decedent until someone came. Hegwood tried to talk to the decedent after he was shot, but the decedent was unable to speak to him.

¶ 35     Hegwood testified that he heard the decedent and Newbern have verbal arguments in the past but never witnessed any physical fights nor observed marks or bruises on her.

¶ 36     Former Chicago Police Officer Margret Susnis testified that on May 20, 2013, at 1:31 p.m., she received a call that an individual was shot at 9625 South Halsted Street. She went upstairs to the third-floor apartment two minutes later, where she saw the decedent lying on his bedroom floor. The bedroom door, which had gunshots in the center of it, was on top of him. Ambulance technicians lifted the door off the decedent.

¶ 37     Officer Susnis attempted to talk to the decedent because she "was afraid he might be dying." The decedent "said that he did not know why they did this to him." In response to Officer Susnis's question of who "they" were, Officer Susnis recalled that he replied, the boyfriend of his wife or girlfriend. Officer Susnis asked if the decedent saw what the person looked like. The decedent said the person had braids, dark skin, and was as tall as him. The decedent said that he

thought the person was 37 years old. The ambulance then transported the decedent to Advocate Christ Hospital in Oak Lawn.

¶ 38    Officer Susnis also spoke with Hegwood, who told her what he witnessed. In contrast to Hegwood's trial testimony, Officer Susnis testified that Hegwood said that he saw Newbern get into the tan-colored Mercury Marquis. He saw two people in the car but was unable to see the driver. The passenger was a woman. Officer Susnis also testified that Hegwood did not tell her that he saw someone throw something into the car's trunk.

¶ 39    Detectives Christopher Tenton, Greg Buie, Don Clark, and Sergeant Donovan Jackson[2] were assigned to investigate this shooting. Upon arriving at the scene, the decedent was already transported to Advocate Christ Hospital. The detectives split up into two teams. Detectives Tenton and Buie went to the hospital, while Sergeant Jackson and Detective Clark remained at the scene.

¶ 40    While at the shooting scene, Sergeant Jackson interviewed Esco, who, in contrast to her trial testimony, told the detective that she entered the dining room after hearing the gunshots and saw the decedent bleeding.

¶ 41    In the meantime, at Advocate Christ Hospital, Detectives Tenton and Buie observed medical staff treating the decedent in the trauma room. Detective Tenton learned that the decedent had sustained five gunshot wounds. Detective Tenton asked the decedent what had happened to him. The decedent told him that he had been shot. Detective Tenton asked the decedent whether he knew who shot him. The decedent told Detective Tenton that his wife's boyfriend had shot him. The decedent said that there was a knock at his door, and upon opening the door, he saw his wife's boyfriend standing at the door holding a gun. The decedent closed the door, and shots struck him

---

[2] On May 20, 2013, Sergeant Jackson had not yet been promoted and was still a detective.

through the door. The decedent fell to the ground, the door came off its hinges, and the door landed on top of him. The boyfriend then entered the room and shot the decedent multiple other times.

¶ 42    The decedent said that he had seen the shooter before and had a previous altercation with him behind the apartment building. The decedent described his assailant as a male black 37 years of age, dark-complected, with short braids, 6'0"-6'2", and weighing 180-200 pounds. He also described the shooter's car as a tan or brown four-door Mercury Marquis. The decedent said that he would be able to identify the shooter and wanted to prosecute.

¶ 43    During the conversation, a nurse walked into the room, and the decedent asked why he could not feel his legs. The nurse informed him that he had a bullet in his spine and was paralyzed. The decedent was then taken out of the room to undergo emergency surgery.

¶ 44    On cross-examination, Detective Tenton testified that when he spoke with the decedent, he did not know whether the decedent was going to live or die. The decedent's statement was neither audiotaped nor videotaped.

¶ 45    Sergeant Jackson and Detective Clark remained at the shooting scene until the arrival of Evidence Technician Anthony Beam. Officer Beam testified that he arrived at 9625 South Halsted Street at about 3:25 p.m., spoke with police personnel, surveyed the scene, photographed it, and marked and recovered firearm evidence. Seven fired cartridge cases and three fired bullets were recovered from the scene. The expended shell casings were 9-millimeter Lugers. The decedent's room door was knocked off the hinges and had what appeared to be bullet holes in it. The recovered evidence was inventoried. The parties stipulated to the chain of custody of the evidence and that the fired bullets were all fired from the same firearm.

¶ 46    At some unspecified time later that day, Newbern, who had been arrested when she returned to the apartment, was interviewed by Sergeant Jackson at the police station. Sergeant Jackson also interviewed Leonard Green and spoke with Newbern's sister.

¶ 47    On May 26, 2013, Sergeant Jackson received a voicemail message from the decedent's sister. After returning the call and speaking with her, Sergeant Jackson went to 1452 West 72nd Street. Sergeant Jackson was looking for a tan or brown-colored Mercury Marquis car. Upon seeing it, Sergeant Jackson ran the car's license plate number to determine the vehicle's registered owner.

¶ 48    A certified copy of a vehicle record for the car was admitted in evidence without objection. It showed that the car, a 2003 Mercury Marquis four-door vehicle, was registered to defendant.

¶ 49    After running the license plate to determine the car's registered owner, Sergeant Jackson compiled a photo array that included a photograph of a person. Sergeant Jackson then went to Advocate Christ Hospital. He continued his investigation in this matter. Sergeant Jackson was looking for a suspect at this time. The suspect had the last name "Arna" and the first name "Davis."

¶ 50    The testimony establishes that defendant was arrested on either May 27, 2013, or May 28, 2013. Sergeant Jackson testified that at the time of defendant's arrest, he was 6'0", weighing approximately 155 pounds, wore his hair in short braids, had a dark complexion, and was 36 or 37 years old. Sergeant Jackson also noticed that one of defendant's eyes "kind of droops a little bit ***."

¶ 51    After defendant's arrest, Hegwood viewed a lineup and identified him as the person he saw on May 20, 2013, leaving the apartment building, placing an item in the car's trunk that he recognized, and driving away.

¶ 52    The victim died on June 17, 2014, at the age of 53. His sister, Sherry Rhone, testified that she last saw her brother on May 19, 2013, at a backyard party. At that time, her brother was healthy. After he was shot, her brother was hospitalized at Advocate Christ Hospital for 30 days. Afterward, he went to Kindred North, where he died one year, one month, and four days after being shot. Ms. Rhone's brother was very agitated after being shot because he could not talk due to the trach tube in his throat. He was also unable to speak, write, or walk due to his injuries. The decedent also had a feeding tube and a colostomy bag.

¶ 53    On the other hand, Newbern testified that she never visited the defendant after he was shot. She did not know where he was and did nothing to find out. Newbern testified that the decedent's family disallowed her from seeing him.

¶ 54    Sergeant Jackson testified that on June 17, 2014, after learning that the victim had died, he spoke with Newbern and showed her a photo array. He did not testify to what, if anything, Newbern said at this time.

¶ 55    At trial Newbern testified that she was again arrested on August 21, 2013. At this time, she denied knowing defendant and told the police that the decedent might have been "messing around" with one of the ladies that lived in the apartment. She said that this might have had something to do with the decedent getting shot.

¶ 56    At trial Newbern testified that her August 21, 2013, statement was a complete lie but that she told it because it was "convenient at the time."

¶ 57    On June 20, 2014, Dr. Kristin Escobar, a forensic pathologist with the Cook County Medical Examiner's Office, conducted an autopsy on the decedent's body. The decedent had a history of a traumatic spinal cord injury and quadriplegia due to multiple gunshot wounds. Dr.

Escobar opined that the victim died of complications from his multiple gunshot wounds and that the manner of his death was homicide. The decedent developed pneumonia because he was quadriplegic and because of the traumatic injury to his spinal cord from the gunshot wounds he sustained the previous year. If not for the gunshot wounds that caused the quadriplegia, he would not have developed pneumonia, his acute and fatal cause of death. The multiple gunshot wounds were the "cascading event" that led to pneumonia.

¶ 58    On July 2, 2014, Newbern was again picked up by the police. She now provided a video-recorded statement in which she said that defendant was involved in the shooting. Newbern came forward with the "truth" because she felt that it was the right thing to do, and it was time for her to stop being scared.

¶ 59    Newbern denied saying that she did not see a gun in defendant's hand. She testified, "No, that can't be true, because when I came out of the bathroom, it was smokey. All I saw was like this black thing, a black gun in his hand, and I believe it was black, in his hand." Newbern was then impeached with her videotaped statement in which she denied seeing a gun in defendant's hand.

¶ 60    The evidence adduced at trial also revealed that both Hegwood and Esco had pending contempt cases for failing to respond to subpoenas issued for them to appear in court in this matter. Both testified that no promises or threats were made regarding that case. Hegwood was uncertain whether the contempt charge would be dismissed. Esco hoped that the contempt charge would be dismissed after she testified, although she was not told that this would happen.

¶ 61    Also, on cross-examination, Hegwood admitted telling Officer Susnis that he did not see the driver of the Mercury Marquis. He denied recalling whether he said that he "saw Adrienne Newbern sneak around, get in the car, and drive through the alley southbound." Hegwood testified

that he did not tell Officer Susnis that he had previously seen defendant because "she never asked." He denied telling Detective Buie that he did not know who owned the Mercury Marquis. Hegwood clarified that while he did not know defendant's name, he was familiar with defendant's face. Detective Buie never asked Hegwood whether he could recognize defendant by his face. Hegwood thought that he told the detective that the person who put something in the car's trunk was a person he had seen previously. Hegwood testified that he was initially hesitant to get involved but later changed his mind.

¶ 62    In defendant's case-in-chief, the parties stipulated that if called to testify, Detective Buie would testify that Hegwood told him that he saw the tan-colored Mercury Marquis outside his home on several occasions but did not know who drove the car. Furthermore, Hegwood never told Detective Buie that the person he saw on four or five prior occasions and identified as defendant, threw something into the trunk of the Mercury Marquis.

¶ 63    At trial, defendant testified as follows. On May 20, 2013, defendant woke up and walked his children to school. Defendant resided at 72nd Street and Green Street. After dropping off his children, defendant returned home and waited for his co-worker, David Scott, to arrive. Scott was a friend who worked odd jobs with defendant. At that time, defendant and Scott were rehabbing the house of a friend, Elaine, at 72nd Street and Ada Avenue.

¶ 64    Scott arrived at defendant's home between 8:30 and 9 a.m. The two then went to Elaine's house and determined that the floor was corroded upon pulling up some bathroom floor tiles. Defendant then called his friend, Juda, to drive them to Home Depot to get supplies to repair the floor. Defendant needed a ride because he had left his car with Newbern the previous day. Newbern needed his car that day to get back and forth from work.

¶ 65    At the time, Newbern and defendant had been casually dating for eight or nine months, and it was not unusual for defendant to loan her his car. Defendant resided with the mother of his children, Tanell Wandas. He had another girlfriend too. Defendant claimed not to know Newbern's precise address and denied having ever been inside her apartment. In the past, defendant picked up Newbern in the area of her home.

¶ 66    Juda drove defendant and Scott to Home Depot. After getting the necessary supplies, defendant returned to the job site. Defendant spoke with Elaine about the fact that more supplies would be needed to make the necessary repairs. Elaine said she did not have money to pay for additional materials, so they scheduled another date to continue the work.

¶ 67    Defendant left Elaine's house at 12 or 12:30 p.m. Juda went his own way, and defendant and Scott walked to Ashland Avenue and took a bus to Scott's apartment at 49th Street and Laflin Street, where they had lunch and a couple of beers. While he was at Scott's apartment, Newbern called him. She sounded "[f]ine, normal." Defendant went back to his house to change his clothes and get ready to retrieve his car from Newbern. Newbern told defendant to meet her at her sister's home, nearby. Defendant went to Newbern's sister's house and picked up his car.

¶ 68    On May 28, 2013, as defendant was driving to the store, he was pulled over by the police. They told him to turn off his car, and he complied. Defendant gave the police permission to search his car.

¶ 69    Defendant testified that he met one of Newbern's friends outside her sister's house a while ago. He denied having ever seen Hegwood before he testified in court. Defendant denied knowing the decedent or shooting him on May 20, 2013.

¶ 70 On cross-examination, defendant said he used to hang out with Scott daily. Scott lived in a two-flat at 4942 South Laflin Street. Defendant did not know where Scott currently resided because he had not talked to him since 2013. Defendant did not know Elaine's last name or her address. Defendant did not know Juda's last name or his phone number. Defendant did not recall his phone number or have any phone records to show where defendant was on May 20, 2013. Defendant did not recall what time he called Juda, what time Juda arrived, or what type of car Juda drove. Defendant had no receipts for the items purchased at Home Depot. Defendant did not recall what time he arrived back at Elaine's house. Defendant did not recall what time Newbern called him.

¶ 71 Defendant testified that in 2013 he wore short braids, weighed 155 pounds, had a mustache and some facial hair, and was about 6'0". Defendant admitted that the Mercury Marquis was his car and had a Mason symbol on it. Defendant was a Mason. Defendant denied ever parking his car in the parking lot at the apartment building or in the alley. When defendant picked up Newbern, he parked a couple of houses down from the building.

¶ 72 Defendant denied that he told the police that he did not know anyone near 96th and Halsted Street. Defendant denied telling the police that he did not know anyone named Adrienne. He could not recall whether he told the police that he did not know anyone who matched Newbern's description.

¶ 73 Defendant denied telling the police that he was in his car the day before the shooting with a light-complected female black with short hair named "Shady." Defendant denied telling the

detectives that he had just met another girl named Kenyatta, in her thirties. He denied telling the police that he went to Cedar[3] the day after the shooting.

¶ 74    Defendant said that he never told the detectives that he was with Scott on May 20, 2013, because they never asked him that question.

¶ 75    In rebuttal, Detective Tenton testified that he and Sergeant Jackson interviewed defendant after his arrest. Defendant was advised of his *Miranda* warnings from a Fraternal Order of Police [FOP] book. Defendant acknowledged his rights and agreed to speak with the detectives. Defendant denied knowing anyone who lived near 95th Street or 96th Street and Halsted Street. He denied knowing anyone named Adrienne or a female black fitting her description: dark-complected, short, with long black hair.

¶ 76    The shooting occurred on Monday, May 20, 2013. Detective Tenton questioned defendant about his activities the day before Sunday, May 19, 2013, and the day after, Tuesday, May 21, 2013. Defendant claimed that the day before the shooting, he was in his car with a girl named Shady, a light-complected female black with short hair. The day following the shooting, defendant said that he went to Cedar. Defendant never told Detective Tenton that he was with David Scott at 1:30 p.m. on May 20, 2013.

¶ 77    On cross-examination, Detective Tenton testified that defendant's statements were neither audiotaped nor videotaped.

¶ 78    After deliberations, the jury found defendant guilty of first-degree murder and found that he personally discharged a firearm that caused the death of another individual.

---

[3] No further details were provided as to where "Cedar" is located.

¶ 79    At sentencing, the decedent's mother, Newhampshire Wooden, read her written victim impact statement to the trial court. In aggravation, the State presented defendant's criminal history, starting with a 1993 burglary conviction for which he received probation. Defendant later violated his probation and was sentenced to the Illinois Department of Corrections (IDOC). He was then convicted of aggravated battery in 1997 and sentenced to serve seven years in the IDOC. In 2007, defendant received a three-year sentence in the IDOC for gun and drug charges.

¶ 80    In mitigation, defense counsel argued that defendant was no longer associated with any gangs. Five siblings and a woman named Lakeshia Wilson attended his trial. They were all devastated by defendant's situation. They loved him and were supportive of him.

¶ 81    Defendant's parents suffered from alcohol and drug abuse. Defendant had learning disabilities and was in special education classes in high school. Defendant completed his General Equivalency Diploma (GED) while in the Cook County Department of Corrections. Defendant was previously employed doing rehabilitation projects. Defendant had children who he helped to support. He was authorized to pick up and drop his children off at school.

¶ 82    Defendant had health issues. His feet swelled because of complications from diabetes. Defendant had psychiatric issues for which he took medication. Defendant took no pride in his criminal behavior. Defendant lacked control over the events in his life.

¶ 83    Counsel urged the court to impose a minimum sentence because defendant had "value" and was a loving brother, son, father, uncle, and nephew.

¶ 84    Defendant made a statement in allocution in which he maintained his innocence.

¶ 85    The trial court sentenced defendant to 23 years in the IDOC plus an additional mandatory minimum 25-year sentencing enhancement.

¶ 86                                  II. ANALYSIS

¶ 87                A. Whether Hearsay Testimony Was Improperly Admitted at Trial

¶ 88    Defendant alleges that the trial court erred by permitting inadmissible hearsay evidence to be admitted at trial. First, defendant alleges that the trial court erroneously allowed Sergeant Jackson to provide testimony which implied that the decedent identified him as the shooter after viewing a photo array. Second, defendant alleges that the trial court improperly permitted Detective Tenton to testify to the decedent's statement at Advocate Christ Hospital two hours after being shot.

¶ 89    The State alleges that both claimed errors have been forfeited. Alternatively, the State maintains that the rulings on the admissibility of such evidence were not in error. We agree with the State.

¶ 90                                  1. Forfeiture

¶ 91    As previously discussed, the admissibility of the decedent's statements to both Officer Susnis and Detective Tenton and the identification of defendant after viewing the photo array compiled by Sergeant Jackson were the subject of extensive pretrial litigation. However, defendant's posttrial motion did not allege that the trial court's ruling allowing Sergeant Jackson to testify regarding his course of investigation was in error. Furthermore, while defendant's posttrial motion did allege that the trial court erred in permitting defendant's statement to Detective Tenton to be testified to, defendant never alleged that such testimony violated the confrontation clause. U.S. Const., amend. VI.

¶ 92    To preserve an error on appeal, defendant must object at trial and raise the issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to set forth the trial court's

alleged errors and specify the grounds for a new trial in a posttrial motion constitutes a procedural default of the issue on review in the absence of plain error. *People v. Naylor*, 229 Ill. 2d 584, 592–93 (2008).

¶ 93    We agree with the State that defendant failed to properly preserve both claimed errors. Defendant did not preserve the course-of-investigation claim in his posttrial motion and never alleged that the admission of the decedent's statement at the hospital violated the confrontation clause. Defendant only sought to exclude the decedent's statements to Officer Susnis and Detective Tenton based on Illinois' hearsay rules. The hearing on the motion and the court's findings were likewise limited to the question of whether such evidence constituted inadmissible hearsay. Nor did defendant's posttrial motion assert a confrontation clause violation.

¶ 94    We reject defendant's claim that he "essentially raised a [c]onfrontation [c]lause challenge" by claiming that the introduction of such hearsay evidence was prejudicial and deprived him of a fair trial. The hearsay claim litigated and decided by the trial court is analytically distinct from the confrontation clause claim that he now advances. Defendant admits as much when he argues that "even if this statement constitutes an excited utterance, the excited utterance exception to the hearsay rule does not resolve the Confrontation Clause issue" and relies on *People v. Sutton*, 233 Ill. 2d 89 (2009), in support of his argument.

¶ 95    *Sutton* demonstrates the problem with defendant's attempt to overcome his procedural default of this claim. In contrast to this case, in *Sutton*, the question of whether the declarant's out-of-court statement to police officers while in an ambulance violated the confrontation clause was litigated before the trial court and decided in defendant's favor. *Id.* at 91. The appellate court found the statement to be testimonial but determined that it did not violate the confrontation clause

because the declarant was available for cross-examination. *People v. Sutton*, 375 Ill. App. 3d 889, 899 (2007).

¶ 96    The supreme court first determined that the statement was admissible under the spontaneous declaration exception to the hearsay rule in reviewing the claimed error. *Sutton*, 233 Ill. 2d at 109. The court then considered whether the statement was testimonial and violative of *Crawford v. Washington*, 541 U.S. 36, 68 (2004), and its progeny. *Sutton,* 233 Ill. 2d at 110-13, 116-20. The court affirmed the appellate court's ruling, agreeing that the declarant's statements in the ambulance were testimonial but finding that their admission did not violate *Crawford* where the declarant was available to testify at trial. *Id.* at 122-23.

¶ 97    Our conclusion that a defendant's challenge to the admissibility of a statement on hearsay grounds is fundamentally different from a confrontation clause challenge finds additional support in *People v. Hughes*, 2015 IL 117242. In *Hughes*, the court rejected defendant's claim that his challenge to the trial court's denial of his motion to suppress was preserved where the grounds alleged in the defendant's motion, while "not factually hostile" to the grounds alleged on appeal, were "almost wholly distinct from one another." *Id.* ¶ 40.

¶ 98    Based on the foregoing, we find defendant's allegations of court error properly regarded as forfeited. Such forfeiture may only be excused if defendant establishes plain error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Specifically, the plain error doctrine permits "a reviewing court to consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred, and that error is so serious that it affected the fairness of the defendant's trial and challenged the

integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Under either prong of the plain error doctrine, the burden of persuasion remains on the defendant. *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 29 (citing *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)).

¶ 99    For the reasons that follow, we find defendant has failed to establish plain error.

¶ 100                    2. Sergeant Jackson's Testimony Was Properly
                            Elicited Course-of-Investigation Testimony

¶ 101   Defendant's claim that improper photo array testimony was admitted at trial is based on the following testimony given by Sergeant Jackson in response to the State's questions:

"THE STATE: You compile the photo array, do you go to Christ Hospital?

SERGEANT JACKSON: Yes.

THE STATE: Do you then later continue your investigation into that day?

SERGEANT JACKSON: Yes.

THE STATE: Are you looking for a suspect at that time?

SERGEANT JACKSON: Yes.

THE STATE: And who are you looking for?

SERGEANT JACKSON: Last name Arna, first name Davis."

¶ 102   Evidentiary rulings are within the trial court's sound discretion and are to be given deference on appeal. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). An abuse of discretion will only be found where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable

person could take the view adopted by the trial court. *People v. Connolly*, 406 Ill. App. 3d 1022, 1026 (2011).

¶ 103    We reject defendant's assertion that the trial court erroneously allowed photo array evidence to be admitted at trial. Defendant successfully moved *in limine* to disallow evidence that upon viewing the photo array at the hospital, the decedent identified defendant as his attacker by affirmatively nodding his head. Judge Lacy determined that such evidence was inadmissible hearsay but permitted the State to elicit testimony which showed that the police: (1) spoke to the victim; (2) showed him a photo array; (3) described what a photo array was; and (4) were looking for defendant after they investigated.

¶ 104    To be clear, no photo array testimony was admitted at trial. The State not only stayed within the limitations set by the trial court but offered less evidence than what the trial court authorized. Sergeant Jackson did not testify that he: (1) took the photo array to the hospital; (2) saw or spoke with the decedent at the hospital; or (3) was looking for defendant after speaking with defendant at the hospital.

¶ 105    The trial court's ruling constituted a proper exercise of discretion. Statements that detail the progress of a police investigation and why the police arrested an individual or took other action fall under the course-of-investigation exception to the hearsay rule. *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23. Evidence properly admitted under the course-of-investigation exception is not hearsay because it is not offered for the truth of the matter asserted. *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010). Testimony of an out-of-court statement offered for the limited purpose of explaining the reason the police conducted their investigation as they did is not hearsay. *People v. Jones*, 153 Ill. 2d 155, 159-60 (1992); *People v. Hunter*, 124 Ill. App. 3d 516, 529 (1984). The

rationale underlying the investigatory course of conduct rule is that "an arresting or investigating officer should not be put in the false position of seeming to have happened upon the scene; he should be allowed some explanation of his presence and conduct." *People v. Cox*, 377 Ill. App. 3d 690, 702 (2007) (citing *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989)).

¶ 106   Even if a jury can infer that the police began looking for defendant due to what a non-testifying witness said, course-of-investigation testimony is proper as long as the testimony does not gratuitously reveal the substance of the statements and inform the jury that they told the police that the defendant was responsible for the crime. *People v. Henderson*, 142 Ill. 2d 258, 304 (1990). Therefore, the testimony also may not include the substance of any conversation with a person who does not testify. *People v. Short*, 2020 IL App (1st) 162168, ¶ 69; *People v. Jura*, 352 Ill. App. 3d 1080, 1088 (2004).

¶ 107   In *People v. Rush*, defendant alleged that the trial court erred in allowing hearsay testimony under the course of investigation exception. *People v. Rush*, 401 Ill. App. 3d 1, 14 (2010). At trial, a sergeant testified that after speaking with a detective and two individuals that he went to the crime scene with a specific description of the gender, weight, height, and hair color and texture of the alleged offender, as well as the fact that he bore a tattoo on his arm. *Id.* at 14-15. The court rejected defendant's claim, finding that such testimony did not violate the defendant's constitutional confrontation rights where it merely explained the investigation undertaken by the police. *Id.* at 16.

¶ 108   Here, Sergeant Jackson was a police officer acting in the line of duty. His scant testimony properly explained the course of the investigation that led to defendant's arrest. The paucity of his testimony not only stayed within the court's ruling but, indeed, was more minimal than what the

ruling allowed. We agree with the State that the substance of Sergeant Jackson's scaled-back testimony did not necessarily lead the jury to infer that the decedent was shown the photo array and identified defendant.

¶ 109   However, even if such inference naturally flowed from the testimony of Sergeant Jackson, it was permissible under *People v. Gacho*, 122 Ill. 2d 221 (1988). In *Gacho*, an officer testified that after speaking with a decedent at the hospital, he and his partner began to look for "Robert Gacho," the defendant. *Id*. at 248. Our supreme court affirmed the admission of the officer's testimony, stating that although any testimony as to the substance of the officer's conversation with the decedent would be improper hearsay, the officer's given testimony "was not of the conversation with [the decedent] but to what [the officer] did and to investigatory procedure." *Id*.

¶ 110   Defendant misplaces reliance on the factually inapposite case of *People v. Sample*, 326 Ill. App. 3d 914 (2001). In *Sample*, two police officers testified that they began searching for the defendant after speaking with the two codefendants. *Id*. at 918. The appellate court found that the State exceeded the boundaries of the course-of-investigation exception where "the repetition of strong inferences that his codefendants implicated defendant in the crimes, the use of those statements to build a substantive link in the State's case, and the State's several comments on the upcoming testimony during opening statement, lead us to conclude that the boundaries set for the investigative process hearsay exception were breached." *Id*. at 924.

¶ 111   Although the State's "serial questions" in *Sample* were designed to cause the jury to infer that defendant was named by his co-offenders, the court nevertheless affirmed defendant's conviction based on the remaining overwhelming evidence of his guilt. *Id*. at 925.

¶ 112   We also reject defendant's claim that the State enhanced the inference that the decedent identified defendant during its closing argument. The State neither discussed nor alluded to the photo array in its closing argument. The State's remarks concerning the decedent's description of defendant and his actions were clearly related to his statements to Detective Tenton and Officer Susnis. We now consider the admissibility of that evidence.

¶ 113            3. Defendant Has Failed to Demonstrate That the Admission of the
                    Decedent's Statement to Detective Tenton Was a Clear Error

¶ 114   On appeal, defendant has abandoned his challenge to the admissibility of the decedent's initial statement to Officer Susnis but maintains that Detective Tenton should have been disallowed from testifying to the statement made by the decedent at Advocate Christ Hospital. Defendant suggests that the statement did not constitute an excited utterance because it was made two hours after the decedent was shot and further maintains that the admission of this testimony violated the confrontation clause. U.S. Const., amend. VI. We disagree with both assertions.

¶ 115                    a. The Excited Utterance Exception

¶ 116   We review the trial court's ruling for an abuse of discretion. *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 72. Evidentiary rulings are within the trial court's sound discretion, and we review such rulings with deference to the trial court. *Caffey*, 205 Ill. 2d at 89. A trial court's ruling will only constitute an abuse of discretion where it is arbitrary, fanciful, unreasonable, or where no reasonable person could take the view adopted by the trial court. *Id*.

¶ 117   "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). To qualify as an excited utterance, "there must be an occurrence sufficiently startling to produce a spontaneous and

unreflecting statement, there must be an absence of time for the declarant to fabricate the statement, and the statement must relate to the circumstances of the occurrence." *Sutton*, 233 Ill. 2d at 107. In determining whether the exception applies, the totality of the circumstances is to be considered. *People v. Williams*, 193 Ill. 2d 306, 352 (2000). The critical question is whether the statement was made while the declarant was still affected by the excitement of the event. *Id.*; *Sutton*, 233 Ill. 2d at 107. The time factor's significance varies with the facts of the case. *Williams*, 193 Ill. 2d at 353. A statement's spontaneity is not destroyed simply because it is made in response to questioning. *Id.* The critical question is whether the excitement of the event predominated when the statement was made. *People v. Smith*, 152 Ill. 2d 229, 260 (1992).

¶ 118   In *Connolly*, the defendant was convicted of domestic battery and endangering the life or health of a child. *People v. Connolly*, 406 Ill. App. 3d 1022 (2011). At trial, his wife denied that defendant struck her. *Id.* at 1023-24. The State was permitted to introduce evidence under the excited utterance exception to the hearsay rule of her statements to a police officer that were made shortly after the incident. *Id.* at 1023. The court determined that the totality of the circumstances supported the trial court's finding that the wife's statements were excited utterances. *Id.* at 1026.

¶ 119   Pretrial, the trial court properly exercised its discretion when it determined that the decedent's statement to Detective Tenton qualified as an excited utterance. *Perkins*, 2018 IL App (1st) 133981, ¶ 68. The statement was the product of a startling occurrence; there was an absence of time for the decedent to fabricate, and the statement related to the circumstances of the occurrence. The passage of approximately two hours from the time of the shooting does not undermine the fact that the decedent, who was in the emergency room at Advocate Christ Hospital

about to undergo surgery and who asked a nurse why he was unable to feel any sensation in his legs, was still affected by the excitement of the event.

¶ 120                              b. The Confrontation Clause

¶ 121   Insofar as defendant's forfeited confrontation clause argument is concerned, the preliminary question of whether the plain error doctrine applies is whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. Whether a defendant has suffered a violation of the confrontation clause presents a question of law and is subject to *de novo* review. *People v. Lovejoy*, 235 Ill. 2d 97, 141-42 (2009); *People v. Burney*, 2011 IL App (4th) 100343, ¶ 45.

¶ 122   Under the sixth amendment, a criminal defendant has the right to be confronted with the witnesses against him. U.S. Const., amend. VI. In *Crawford v. Washington*, the Supreme Court held that the confrontation clause disallows "testimonial" hearsay statements from being admitted against a criminal defendant unless the declarant is unavailable to testify, and the defendant has had an opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68.

¶ 123   In *Davis v. Washington*, the Supreme Court held that statements will not be deemed testimonial when made in the course of a police interrogation where "the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" rather than "to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006).

¶ 124   In *Michigan v. Bryant*, the Supreme Court noted that standard rules of hearsay, designed to identify statements as reliable, are relevant in determining whether a statement is testimonial. *Michigan v. Bryant*, 562 U.S. 344, 356-57 (2011). Excited utterances are considered reliable because the stress of the excitement of an emergency focuses an individual on ending the

threatening situation as opposed to fabricating a story for prosecution purposes. *Id*. at 361-63. An assessment of whether an emergency is ongoing "cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id*. at 363. The *Bryant* court also recognized that police officers may have dual motives to respond to an emergency situation and gather evidence. *Id.* at 368.

¶ 125   In determining whether an emergency is ongoing, courts should consider whether the offender is still on the loose, the type of weapon employed, the motive for the offense, and the decedent's medical state. *Id*. at 365, 373-74.

¶ 126   An additional factor that may be considered is the formality of the interrogation. *Id.* at 377. A formal interrogation in a police station is more likely to provoke a testimonial statement than less formal questioning. *Ohio v. Clark*, 576 U.S. 237, 245 (2015).

¶ 127   Here, defendant relies on four "facts" to support his claim that the admission of the decedent's statement violated the confrontation clause: (1) two hours transpired before the statement was made; (2) the decedent was "safe in the hospital" when the statement was made; (3) "the detectives chose not to record the interview"; and (4) "the detectives asked questions to establish events that occurred previously."

¶ 128   Regarding defendant's claim that the detectives' questions were designed to establish events that already occurred, defendant relies on Detective Tenton asking the decedent "what happened to him." We reject defendant's reliance on this question as supporting his claim.

¶ 129   In *People v. Feliciano*, the court held that a police officer's question "[s]imply asking what happened certainly cannot be construed here as an attempt to identify a perpetrator for future prosecution of a case." *People v. Feliciano*, 2020 IL App (1st) 171142, ¶ 95.

¶ 130   In *Burney*, the defendant alleged that the trial court erred in admitting the victim's hearsay statements. *Burney*, 2011 IL App (4th) 100343, ¶ 34. The court rejected defendant's claim that the victim's statements were testimonial where the suspect remained on the loose after barging into the elderly victim's home and demanding her car keys. *Id.* ¶ 53. The court found it "reasonable to conclude the police interrogation of [the victim] sought to bring an end to the situation." *Id.*

¶ 131   Additionally, the court distinguished *Sutton*. *Burney*, 2011 IL App (4th) 100343, ¶ 54. The court found no indication that the officer conducted a "structured interrogation," and the informality of the encounter with the victim suggested that the officer was seeking to discern the facts of an ongoing emergency. *Id.*

¶ 132   In contrast, in *Sutton*, after questioning the victim at the scene and receiving a detailed description of the offender, the same officer again questioned the victim who was in an ambulance on the way to the hospital. *Sutton*, 233 Ill. 2d at 89. The officer testified, "I asked him, can you please tell me again exactly what happened tonight," at which point the victim provided a second narrative of the events of that evening. *Id.* at 118-19.

¶ 133   The court noted that the scene was fully secured by the time the question was asked and that the officer's questions were not directed at addressing an ongoing emergency. *Id.* at 119. The court further noted that the officer did not dispatch the second description of the assailant following his questioning of the victim, nor did he dispatch any information from the ambulance to investigators at the scene. *Id.* Based on the totality of the circumstances, the court rejected the State's claim that the interrogation in the ambulance was conducted to assist in an ongoing emergency. *Id.*

¶ 134   Viewed objectively, defendant has failed to establish a clear or obvious error in the admission of the decedent's statement to Detective Tenton at Advocate Christ Hospital. In contrast to *Sutton*, where the defendant's confrontation clause claim was fully litigated before the trial court, defendant only raised a hearsay objection to the admissibility of the decedent's statement at Advocate Christ Hospital. As such, the State was never obligated to establish the primary purpose of Detective Tenton's interview to counter a later-waged claim that the testimony would violate the confrontation clause.

¶ 135   The record in this matter disallows us from concluding that defendant has established a clear or obvious error. The evidence supports the conclusion that at the time that this statement was made, the police (1) were still uncertain as to why this crime occurred; (2) knew that the offender was still on the loose; (3) knew that the offender left the scene armed and in a car; and (4) knew that a second individual was potentially at risk. While the timeline does not establish precisely when Newbern was arrested on May 20, 2013, the testimony suggests that her arrest occurred after the decedent was interviewed at the hospital. Based on what the police learned at the scene of the offense and the decedent's initial statement to Officer Susnis, they arguably had reason to believe that the emergency was ongoing until Newbern was located.

¶ 136   Furthermore, based on the manner in which Detective Tenton testified, the record only establishes that he asked the decedent two questions: (1) what had happened to him; and (2) whether he knew who shot him. As in *Burney*, nothing supports the conclusion that Detective Tenton conducted a "structured interrogation" of the decedent. The interview was prematurely terminated when the decedent was wheeled off to emergency surgery. In light of the totality of the

circumstances, we do not believe that defendant has established Detective Tenton's interview of the decedent violated the confrontation clause.

¶ 137                    4. The Evidence Was Not Closely Balanced

¶ 138   Even if we were to agree with defendant that the court erred in allowing improper course-of-investigation testimony or testimony that violated the confrontation clause, we would still find that defendant has failed to establish plain error in this case. The record in this matter not only fails to establish that the evidence was closely balanced but compels the conclusion that the evidence of defendant's guilt was overwhelming.

¶ 139   We begin by noting that defendant does not challenge the decedent's initial statement to Officer Susnis. That statement named Newbern's "boyfriend" as his assailant and described defendant's appearance. The description was corroborated by Sergeant Jackson who testified that at the time of defendant's arrest, he was 6'0", weighed approximately 155 pounds, wore his hair in short braids, had a dark complexion, and was 36 or 37 years old.

¶ 140   Additionally, Sergeant Jackson also noticed that one of defendant's eyes "kind of droops a little bit ***." This unique facial feature was consistent with Esco's description of defendant as having an eye that made him appear to have had a stroke and corroborated her testimony generally. It also corroborated her claim that she previously met defendant and actually rode to a liquor store with Newbern in his car.

¶ 141   Newbern's trial testimony wherein she recounted that upon seeing defendant with the gun in hand that she said "[n]o, no, no," was also corroborated by Esco's testimony that after hearing gunshots she heard someone utter those very words.

¶ 142   After defendant's arrest, Hegwood identified defendant after viewing a lineup. In court, he testified that defendant was the person he saw on May 20, 2013, leaving the apartment building, placing an item in the trunk of a car that he recognized, and driving away.

¶ 143   While defense counsel successfully impeached the testimony of all three witnesses to various degrees, their overall testimony provided a clear, cohesive, generally consistent account of defendant's relationship with Newbern and his actions on May 20, 2013. Furthermore, their testimony was consistent with and corroborated by the uncontested and significant fact that defendant was the registered owner of the Mercury Marquis, which bore a unique Mason decal.

¶ 144   Defendant's uncorroborated alibi testimony did nothing to undermine the substantial proof of his guilt. Defendant's testimony reinforced the fact that Newbern was his girlfriend at the time of the shooting, that he owned the Mercury Marquis, that the car had a Mason decal, and that defendant was a Mason.

¶ 145   Defendant's trial testimony that he was never inside the apartment, had never met Hegwood or Esco or given Esco a ride to a liquor store was directly contradicted by Hegwood, Esco, and Newbern's testimony. Defendant's testimony regarding what he told the detectives when he was arrested was impeached by Detective Tenton. His alibi testimony was devoid of any corroboration.

¶ 146                                5. Cumulative Error

¶ 147   Having found an insufficient showing of a clear or obvious error in the testimony of Sergeant Jackson or Detective Tenton, we reject defendant's claim that the cumulative effect of the errors denied him a fair trial where defendant has failed to make a showing of individual error.

*People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 46. As our supreme court noted in *Albanese*, "The whole can be no greater than the sum of its parts." *People v. Albanese*, 102 Ill. 2d 54, 82-83 (1984).

¶ 148                    B. Defendant Was Not Denied the Effective Assistance of Counsel

¶ 149   Defendant also claims that he was denied the effective assistance of counsel based on trial counsel's failure to interpose an objection to an allegedly improper cross-examination question asked of defendant and by failing to object to remarks made by the prosecutor during closing argument. Specifically, defendant maintains that counsel should have objected to the following question: "You never told the detectives that you were with David Scott on May 20, 2013?" Defendant maintains that trial counsel's failure to object to this question resulted in a response that violated *Doyle v. Ohio*, 426 U.S. 610 (1976). He further maintains that trial counsel failed to object to remarks that shifted the burden of proof and remarks that relied on the alleged *Doyle* violation, where it characterized defendant's alibi as "made up."

¶ 150   Under the familiar test outlined in *Strickland v. Washington*, 466 U.S. 668, 685 (1984), and adopted by our supreme court in *Albanese*, 104 Ill. 2d at 525, defendant must establish both that trial counsel's performance was objectively unreasonable under prevailing professional norms, and a reasonable probability that, but for the unprofessional performance, the outcome would have differed. To establish deficient representation, the defendant must overcome the strong presumption that the challenged inaction might have been the result of sound trial strategy. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). To establish prejudice, the defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *People v. Evans*, 186 Ill. 2d 83, 93 (1999). If a claim can be disposed of

based on an insufficient showing of prejudice, a reviewing court need not consider whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 151                                1. Factual Background

¶ 152    In order to address defendant's contentions of error, we begin by considering the manner in which these claims were litigated before the trial court. On recross-examination, when the State asked defendant about his failure to tell the detectives that he was with Scott on the date of the offense, defendant replied, "[t]he detectives never asked me that question."

¶ 153    After defense counsel asked defendant one additional unrelated question on redirect examination, the defense rested. In rebuttal, Detective Tenton testified that defendant never told him that he was with a person named David Scott at 1:30 p.m. on May 20, 2013.

¶ 154    Defense counsel then moved to restrain the State from being permitted to argue in closing argument that defendant did not tell the police about David Scott when he was questioned because defendant asserted his right to counsel at some point during the interview. Counsel maintained that the State should be prevented from arguing that defendant should have told the police about the alibi because such argument would be improper.

¶ 155    The trial court initially noted that defendant's failure to mention David Scott was "fair game" but should not be dwelled on. However, the following day, the trial court revisited defendant's motion *sua sponte*. The court expressed its concern that the testimony did not establish that upon being questioned by the police defendant was informed of the date of this offense or asked where he was on that date. The trial court cited the case of *People v. Chriswell* in support of its ruling disallowing the State from arguing that defendant did not mention his alibi during the police interview. *People v. Chriswell*, 133 Ill. App. 3d 458 (1985).

¶ 156   We now consider the applicable law for determining whether the State's cross-examination of defendant violated *Doyle v. Ohio*, 426 U.S. 610 (1976).

¶ 157                                         2. Relevant Caselaw

¶ 158   A defendant's post-arrest silence after being Mirandized may not be used to impeach his trial testimony. *Doyle v. Ohio*, 426 U.S. 610 (1976). The prohibition does not apply when a defendant makes a voluntary statement to the police and relates a version that is inconsistent with his trial testimony. *Anderson v. Charles*, 447 U.S. 404, 408 (1980); *People v. Rehbein*, 74 Ill. 2d 435 (1978); *People v. Herrett*, 137 Ill. 2d 195, 213-14 (1990).

¶ 159   The State may remark on a defendant's post-arrest silence when his in-court testimony is inconsistent with the statement previously given to the police. *People v. Frieberg*, 147 Ill. 2d 326, 356 (1992). In making this determination, the court considers whether the defendant's post-arrest statements go beyond mere denial of knowledge and are manifestly inconsistent with exculpatory trial testimony. *Id*. at 356. Where a defendant omits significant details in his initial version that are inconsistent with his trial testimony, the State may use the inconsistency to test the defendant's theory of defense. *People v. Maggio*, 2017 IL App (4th) 150287, ¶ 24, *People v. Mischke*, 278 Ill. App. 3d 252, 265 (1995).

¶ 160   In *Chriswell*, in his police interview, the defendant made a partial statement denying his involvement in the offense and a substantive statement regarding his ownership of a car observed near the scene at the time of the burglary. *Chriswell*, 133 Ill. App. 3d at 466. The court noted that the record did not indicate whether the defendant was ever questioned as to his whereabouts during the interview on the date and time that the offense was committed. *Id*. at 464.

¶ 161    After testifying that he could not recall whether the police asked him where he was on the date of the offense, the defendant later testified that he "could have told them" that he was at home. *Id*. The State did not call a rebuttal witness to establish that the defendant was asked about his whereabouts on the date and time in question. *Id*. Based on the foregoing facts, the court concluded:

> "Thus, it is manifest that there was no inconsistency between the substantive statement which was given by defendant and defendant's subsequent trial testimony regarding his alibi. In both versions, the defendant claimed his innocence and his lack of any knowledge of the incident in question." *Id*.

¶ 162    Finding it improper to question a defendant about his post-arrest silence unless his trial testimony is inconsistent with the pretrial statements made to the police, the court determined that the State's cross-examination on this point was improper. *Id*. at 466. Despite the error, based on the overwhelming evidence of defendant's guilt, the court affirmed defendant's conviction. *Id*.

¶ 163    In *People v. Gagliani*, the defendant alleged that the State's repeated questions concerning his failure to offer an exculpatory version of events to the police when he was initially questioned violated *Doyle*. *People v. Gagliani*, 210 Ill. App. 3d 617, 624 (1991).

¶ 164    When the police initially questioned him, the defendant denied knowing anything about the crimes or how his fingerprints came to be found in the decedent's home. *Id*. at 621. At trial, the defendant testified that he was acquainted with the decedent and admitted having consensual sex with her in her home on three prior occasions. *Id*. at 623. The State repeatedly questioned the defendant about his failure to provide the exculpatory version he testified to when the police asked

him. The trial court sustained defense counsel's objections to such questions. *Id*. at 625-26. The defendant failed to preserve the claimed error in his posttrial motion. *Id.*

¶ 165   The appellate court found that the plain error rule applied where the evidence was closely balanced. *Id*. at 626. The court agreed with defendant that the State's cross-examination was improper and violated *Doyle*. *Id.* The prosecutor's questions improperly "suggested that [the] defendant's trial testimony was fabricated because he could have told the police officers the same story during the investigation but did not." *Id.* Where defendant's credibility was integral to his defense of consent, the improper cross-examination provided the jurors an impermissible basis for believing that defendant's trial testimony was fabricated. *Id*. at 627.

¶ 166    3. Whether Defense Counsel's Failure to Object to the State's Cross-Examination
of Defendant Was Deficient Under the First Prong of *Strickland*

¶ 167   With this factual and legal backdrop in place, we now consider whether defense counsel's failure to object constituted deficient performance. Our decision hinges on whether or not the State's cross-examination question was proper.

¶ 168   The State's question was improper. The record fully supports the conclusion that the trial court realized this when it revisited defendant's motion *sua sponte* after independently researching the issue. The testimony is unambiguous. Not only did the State fail to offer any evidence to establish that defendant was ever asked his whereabouts on May 20, 2013; additionally, Sergeant Jackson testified that he asked defendant his whereabouts the day before the offense (Sunday, May 19, 2013), and the day following the offense (Tuesday, May 21, 2013).

¶ 169   The trial court properly relied on *Chriswell* to find that an insufficient foundation was established for the State to be permitted to remark on defendant's failure to provide the alibi to the detectives when he was initially interrogated. Based on the trial court's ruling, we have no doubt

that the trial court would have sustained an objection to this question had it been made. Under *Chriswell* and *Gagliani*, the State's single cross-examination question was improper.

¶ 170   At oral argument, before this court, the State maintained that no error occurred and relied on *People v. Hinson*, 70 Ill. App. 3d 880 (1979), to support its contention. However, *Hinson* is distinguishable. In *Hinson*, defendant's testimony at trial established that when he was initially questioned, the arresting officer questioned him about his whereabouts on the date and time of the offense *Id.* at 884. Specifically, in response to the defendant being asked whether the arresting officer "questioned you about what happened the day before at the Bilbruck residence," defendant replied "Yes, he did." In response to the State's follow-up question of "And you told him you didn't know anything about it?" the defendant replied "Yes, sir."

¶ 171   The State claimed that the questions asked of the defendant in *Hinson* related to his whereabouts the day before the offense was committed. A close review of *Hinson* belies this claim. The prosecutor's reference to "the day before" clearly related to the date of the offense and the precise time of the offense was referenced in a follow-up question.

¶ 172   The State in the instant case further maintains that defense counsel's failure to object to the question of whether defendant told the police about David Scott should be regarded as trial strategy. We disagree. Even if we were to conclude that counsel determined that it was better to have defendant respond to the question rather than leave it unanswered, this does not explain defense counsel's failure to object to the same testimony being elicited through Detective Tenton. Detective Tenton's unchallenged rebuttal testimony underscored the fact that defendant never mentioned David Scott when he was questioned. In the absence of sufficient questioning to show

that defendant was asked during his initial statement where he was at the time of this offense, the question should not have been asked.

¶ 173   We next turn to defendant's related claim that this error was exacerbated by defense counsel's failure to object to what he regards to be improper remarks by the State during its closing argument.

¶ 174                    4. Remarks Made During the State's Closing Argument

¶ 175   Defendant claims trial counsel was also deficient for failing to object to improper remarks made by the State during closing argument. First, defendant alleges that counsel interposed no objection to a remark that improperly shifted the burden of proof. Placed in context, the challenged remarks are:

"THE STATE: But I also want to be very clear on this, which is what I want to say is they have no burden, okay? But when they present evidence, when the defendant got up on the stand he put his credibility at issue. And again, that Instruction [1.02], the one I just read to you, that shows that you can consider his testimony. *And in assessing, trying to see if maybe his testimony is credible, is corroboration. And David Scott is not here to corroborate it.*

And again they don't have to put him on. *They don't have a burden. But it goes to his credibility.* Because, really? I mean the person that has the most interest in lying in this case, the person who has the biggest motive, the most reason to lie to you is him, the person sitting charged with first degree murder.

And David Scott, and this story of, well, we were having lunch and had a couple of beers, you know? David Scott and that fiction that he created over the last

six years is just that. It's a story that he can't even keep straight. David Scott is no more real than the bogeyman. *It's made up.* He doesn't exist, just like the bogeyman.

And just because he got up and told you that doesn't make it so. You assess his credibility. You treat his testimony like anyone else.

He lied to you. He told you a story that isn't true. And even worse, he lied to you about lying to the police. ***'" (Emphases added.)

¶ 176    We reject defendant's claim that the foregoing remarks improperly shifted the burden of proof. It is well-established that "where a defendant injects into the case the name of an alibi witness and then fails to call the witness, the prosecutor may legitimately comment on the lack of such evidence although it may not be relied upon as proof of the charge." *People v. Kubat*, 94 Ill. 2d 437, 498 (1997). The State's remarks did not exceed the bounds of proper closing argument.

¶ 177    We also reject defendant's claim that trial counsel was deficient for failing to object to remarks that "built on the *Doyle* violation to cast doubt on [defendant's] alibi." As was previously discussed, defendant received a favorable ruling on his motion *in limine* that prohibited the State from relying on defendant's failure to tell the detectives about Scott when he was interrogated. While counsel did not immediately object to the State's question, his motion ensured that the admission of such evidence would not be exacerbated by the State's closing argument.

¶ 178    Defendant relies on *People v. Ridley* to support his claim. *People v. Ridley*, 199 Ill. App. 3d 487 (1990). The facts of *Ridley* bear no resemblance to the facts of this case. In *Ridley*, in rebuttal closing argument, the State explicitly relied on testimony that was improperly elicited by

their improper cross-examination questions, thereby inviting the jury to infer that the alibi defense was a recent fabrication. *Id.* at 493.

¶ 179   No such transgression occurred in this case. Trial counsel's motion effectively prevented the error in the cross-examination question from being exacerbated.

¶ 180   We have thoroughly reviewed the record and find that the State strictly adhered to the trial court's ruling prohibiting it from making any remarks about defendant's failure to tell the police about Scott. The State made no reference, either explicit or implicit, to defendant's failure to provide the alibi sooner. Rather, the State properly recounted the many examples of how defendant's trial testimony was directly inconsistent with Detective Tenton's rebuttal testimony. In sum, we find no error in the State's closing argument.

¶ 181                    5. Whether Defendant Has Established Resulting Prejudice

¶ 182   While we agree with defendant that he should not have been asked whether he told the police that David Scott was with him when this offense was committed, we do not believe that he has satisfied the second prong of *Strickland* by showing any resulting prejudice. A defendant shows prejudice when there is a reasonable probability that, but for the deficient performance, the result of the proceedings would have differed. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 183   We do not believe that there is a reasonable probability that the outcome of this trial would have differed had this single question not been asked. Defendant was properly impeached on many points where his trial testimony as to what he told the detectives directly conflicted with Detective Tenton's rebuttal testimony. We cannot say that a single improper question resulted in prejudice, where defendant provided an explanation for why he did not mention Scott and where, as

previously indicated, the testimony of Detective Tenton inferentially supported defendant's claim. Moreover, as we have previously noted, error aside, the evidence of defendant's guilt was overwhelming. Had this single question not been asked, we do not believe that the outcome of this trial would have differed.

¶ 184                                    III. CONCLUSION

¶ 185   For the foregoing reasons, defendant's conviction and sentence are affirmed.

¶ 186   Affirmed.